[ PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APRIL 21, 2005
THOMAS K. KAHN
CLERK

_____

No. 03-11870

_____

D. C. Docket No. 01-00869-CR-JLK

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

VIKA VERBITSKAYA,
a.k.a. Victoria Verbitsky
a.k.a. Vika Rounick
a.k.a. Victoria Pakuk
ALEXANDER VERBITSKY,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(April 21, 2005)

Before BIRCH, KRAVITCH and CUDAHY[*], Circuit Judges.

_____

[*]Honorable Richard D. Cudahy, United States Circuit Judge for the Seventh Circuit,
sitting by designation.

KRAVITCH, Circuit Judge:

Vika Verbitskaya and Alexander Verbitsky appeal their convictions and sentences for conspiracy to obstruct, delay and affect interstate and foreign commerce by extortion in violation of 18 U.S.C. § 1951(a) ("The Hobbs Act") and for unlawfully obstructing, delaying and affecting interstate and foreign commerce by extortion in violation of 18 U.S.C. § 1951(a)&(b)(2).

**I.**

The relevant facts and procedural history are as follows. Stanislov Khazanov notified the Federal Bureau of Investigation ("FBI") in October of 2000 that he was being extorted by his former girlfriend Vika Verbitskaya. Khazanov, a Russian immigrant now living in Florida, had received a settlement of approximately $1,000,000 from two out-of-state insurance companies[1] following the tragic death of his wife Anna, who was killed in an automobile accident on November 15, 1999. After he paid lawyers' fees and set up a trust fund for his daughter, $250,000 remained. He used a portion of the settlement to incorporate Glamour International Productions.[2] Khazanov also possessed twenty-seven paintings that his mother had transported from Russia, which he intended to use to

---

[1]One was New Hampshire Insurance Company, headquartered in New Hampshire, and the other was State Farm Insurance Company, headquartered in Illinois.

[2]The company was created to bring Russian dancers and performers to the United States to perform and teach dancing.

open an art gallery where he would sell Russian artwork.

Verbitskaya had lived with Khazanov from May or June of 2000 through September of 2000, when the relationship ended. During that time, Verbitskaya became aware of Khazanov's paintings and the insurance money he received from the settlement. After the relationship ended, Verbitskaya began calling Khazanov frequently to ask him for money. During one two-week period, Khazanov received eighteen messages from her on his answering machine. Verbitskaya threatened to tell the authorities that Khazanov had raped her if he did not give her money.

In August of 2001, Verbitskaya called Khazanov and attempted to make amends for her past behavior. She stated that she had started a new life and would like to be friends. Verbitskaya visited Khazanov and his new girlfriend, Olga Petrounina, on August 18, 2001. At Khazanov's residence, Verbitskaya admired several paintings and a grand piano. She proposed that she help Khazanov sell the paintings, and they scheduled a meeting at her condominium.

On August 22, 2001, Khazanov and Petrounina brought five paintings to Verbitskaya's residence, where Verbitskaya introduced Verbitsky as a potential buyer. Petrounina went with Verbitskaya to take her dog for a walk and to get the paintings from her car. After Verbitskaya and Petrounina left, Verbitsky assaulted Khazanov with a golf club, stabbed him in the arms with a knife, and threatened

3

him while holding a gun. Verbitskaya and Petrounina then returned to the condominium. Petrounina observed the bruises on Khazanov and the golf club in Verbitsky's hand. She was immediately told to leave the apartment. While Petrounina waited for Khazanov in the lobby, Verbitskaya joined Verbitsky in beating Khazanov with the golf club.

Verbitsky and Verbitskaya forced Khazanov to sign receipts indicating that the paintings had been sold to them for $2,630 and that the piano had been sold to them for $15,000. They ordered Khazanov to have the items delivered to them on August 23, 2001. Verbitsky also ordered Khazanov to transfer $260,000 to a Swiss bank account.[3] To ensure his compliance, Verbitsky threatened to kill Khazanov's parents and to have his daughter raped by the Russian mafia if he did not abide by Verbitsky's demands. They also forced Khazanov to record on an audiotape that he had raped Verbitskaya. Verbitskaya's voice could be heard in the background of the tape telling Khazanov what to say.

Following Khazanov's release from Verbitskaya's residence, he and Petrounina reported to the police the theft of the artwork and the extortion of his insurance settlement money. Khazanov and Petrounina returned to Verbitskaya's condominium building, accompanied by detectives, and identified Verbitskaya in

---

[3]Verbitsky gave Khazanov a slip of paper with the Swiss bank account number on it.

the lobby.  Detectives then proceeded to Verbitskaya's condominium, identified themselves as law enforcement officers, and waited for Verbitsky to open the door. Verbitsky thought the police were members of the Russian mafia and shouted that he was "one of them."  When Verbitsky admitted the detectives into the residence, they found several pieces of artwork in plain view.  Verbitsky and Verbitskaya were arrested and later indicted by a federal grand jury for violations of the Hobbs Act.[4]

Before the case proceeded to trial, the district court held a charge conference on the government's proposed jury instructions.[5]  Both defendants objected to the government's definition of the interstate commerce requirement.  The court overruled all objections and adopted the government's proposed instructions.  At the close of the government's case, the defendants moved for judgments of acquittal, arguing that the government had "failed to provide sufficient evidence to

---

[4]The defense made an oral motion to dismiss the indictment based upon perjury by Khazanov during the grand jury proceedings.  Before the grand jury, Khazanov denied having had a relationship with Verbitskaya .  The court denied the motion.  Khazanov later admitted at trial that the two were involved romantically six months after his wife passed away.

[5]The instructions read as follows: "You are instructed that you may find the required effect upon interstate commerce has been proved if you find beyond a reasonable doubt that: (1) the paintings were taken from Stanislav Khazanov and those paintings were sent from Russia to be sold in the United States; or (2) money was demanded by the defendants from Stanislav Khazanov, and this money was to be transferred from a bank account in the United States to a bank account in the country of Switzerland; or (3) that the funds to be taken [from] Stanislav Khazanov came from insurance companies outside the state of Florida and were placed in an account in the state of Florida; or (4) Stanislav Khazanov's Bank of America account was used to do business outside the State of Florida."

establish jurisdiction of this Court to hear these particular charges . . . ."  The court

dismissed the motion.  After the defendants completed their defense, they renewed

their motions for acquittal, which the court again denied.  Following the

completion of a seven day trial, the jury convicted Verbitsky and Verbitskaya on

both counts.  The judge sentenced Verbitsky to 120 months in prison and

Verbitskaya to 108 months in prison.[6]

## II.

## A.

On appeal, Verbitskaya makes three arguments.  Her first argument is that

the district court erred when it instructed the jury that only a "minimal" effect and

not a "substantial" effect on interstate commerce was necessary to prove a

violation of the Hobbs Act, 18 U.S.C. § 1951(a).  Our review of a trial court's jury

instructions is limited.  If the instructions accurately reflect the law, the trial judge

is given wide discretion as to the style and wording employed in the instruction.

*United States v. Fulford*, 267 F.3d 1241, 1245 (11th Cir. 2001).  Under this

standard, "we examine whether the jury charges, considered as a whole,

sufficiently instructed the jury so that the jurors understood the issues and were not

---

[6]At sentencing, Verbitsky contended that no firearm was used in the commission of the offense and that he did not own a firearm.  The judge rejected this contention and sentenced Verbitsky under Section 2B3.3 of the Federal Sentencing Guidelines for "otherwise using" a firearm during the commission of the offense.

misled." *Id.* (citing *Carter v. DecisionOne Corp.*, 122 F.3d 997, 1005 (11th Cir. 1997). "We will reverse the district court because of an erroneous instruction only if we are left with a substantial and ineradicable doubt as to whether the jury was properly guided in its deliberations." *Id.* (internal quotations omitted).

The Hobbs Act provides that "[w]hoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do . . . shall be fined under this title or imprisoned not more than twenty years, or both." 18 U.S.C. § 1951(a). The Act defines commerce as being "commerce within the District of Columbia, or any Territory or Possession of the United States; all commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof; all commerce between points within the same State through any place outside such State; and all other commerce over which the United States has jurisdiction." *Id.* § 1951(b)(3).

This Circuit long has held that the jurisdictional requirement under the Hobbs Act can be met simply by showing that the offense had a "minimal" effect on commerce. *United States v. Jackson*, 748 F.2d 1535, 1537 (11th Cir. 1984); *see also United States v. Summers*, 598 F.2d 450, 454 (5th Cir. 1979).[7] Verbitskaya

_____

[7]The Eleventh Circuit, in the *en banc* decision *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981), adopted as precedent decisions of the former Fifth Circuit rendered prior

argues that *United States v. Lopez*, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995) altered this long-standing position and, that therefore, the district court erred.[8] Specifically, Verbitskaya contends that *Lopez* expressly required the "substantial" effects test to apply to Congressional legislation involving criminal statutes in areas traditionally left to the states. Verbitskaya further contends that *United States v. Morrison*, 529 U.S. 598, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000) also requires this Circuit to apply the substantial effects test for Hobbs Act violations.

Our precedent is clear, however, that "even after *Lopez* a conviction [under the] Hobbs Act . . . requires proof of a minimal, not substantial, effect on commerce" and that "*Morrison* does not alter our Hobbs Act precedent." *United States v. Gray*, 260 F.3d 1267, 1274 (11th Cir. 2001). The Gray court reasoned that unlike the Guns Free School Act at issue in *Lopez* and the Violence Against Women Act at issue in *Morrison*, "the Hobbs Act contains an explicit jurisdictional element confirming that the Act was indeed passed pursuant to Congress's power

---

to October 1, 1981.

[8]In *Lopez*, the Supreme Court "identified three broad categories of activity that Congress may regulate under its commerce power." *Lopez*, 514 U.S. at 558. First, Congress may regulate the "use" of the channels of interstate commerce. *Id.* Second, Congress may regulate "the instrumentalities" of interstate commerce. *Id.* Third, Congress may regulate those activities which "substantially affect" interstate commerce. *Id.* at 558-59. Verbitskaya argues that the Hobbs Act falls under the third category.

to regulate interstate commerce." *Id.*; *see also United States v. Castleberry*, 116 F.3d 1384, 1387 (11th Cir. 1997). Though Verbitskaya urges us to change this long-standing position, we decline to do so.

Verbitskaya next argues that three of the government's four theories of how the extortion affected interstate commerce were legally insufficient and that, therefore she is entitled to a new trial because the jury only returned a general verdict. Under *Griffin v. United States*, 502 U.S. 46, 58-59, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991), a general verdict cannot be sustained if any of the possible bases of conviction were legally erroneous. *See also*, *Zant v. Stephens*, 462 U.S. 862, 881, 103 S.Ct. 2733, 2745, 77 L.Ed.2d 235 (1983) ("if the jury was instructed that it could rely on any of two or more independent grounds, and one of those grounds is [legally] insufficient, because the verdict may have rested exclusively on the insufficient ground" reversal is required).

The district court instructed the jury that it could find the required effect upon interstate commerce based on any one of the government's following four theories: (1) that defendants' extortion of Khazanov's paintings, which were sent from Russia, prevented Khazanov from selling the paintings in his art gallery; (2) money the defendants demanded from Khazanov was to be transferred from a United States bank account to a Swiss bank account; (3) the money Khazanov

9

would have used to pay the extortionate demands was derived from the settlement in his wife's wrongful death lawsuit which came from an out-of-state insurance company; or (4) the money Khazanov would have used to pay the extortionate demands was being maintained by Khazanov in a bank account that Khazanov used to engage in interstate business.

Verbitskaya contends that theories one, three and four were not properly submitted to the jury.[9] Specifically, Verbitskaya contends that these three theories do not fit the test formulated in *United States v. Collins*, 40 F.3d 95, 100 (5th Cir. 1994), which she claims this Circuit adopted in *United States v. Diaz*, 248 F.3d 1065, 1084-85 (11th Cir. 2001). Under this test, extortion directed toward an *individual* violates the Hobbs Act only if: (1) the acts deplete the assets of an individual who is directly and customarily engaged in interstate commerce; (2) the acts cause or create the likelihood that the individual will deplete the assets of an entity in interstate commerce; or (3) the number of individuals victimized or the sum at stake is so large that there will be some cumulative effect on interstate commerce. *Id.* Though we use this test as a guideline, we note that this Circuit has

---

[9]Verbitskaya concedes that theory two was properly presented at trial. *See United States v. Kaplan*, 171 F.3d 1351, 1355 (11th Cir. 1999) (en banc) (upholding a defendant's conviction for conspiracy to violate the Hobbs Act based on evidence that the conspiracy required at least one transaction between Florida and Panama).

not expressly adopted the Fifth Circuit's test.[10]

Under the first theory, i.e. the obstruction of Khazanov's ability to sell his paintings in interstate commerce, Verbitskaya argues that the paintings were not owned by an entity engaged in interstate commerce nor was Khazanov an individual who was "directly and customarily engaged in interstate commerce." Specifically, Verbitskaya contends that the paintings were Khazanov's personal property and were hung in his personal residence.

Upon review of the record, we conclude that there was ample evidence for the jury to find that the theft of the paintings interfered with their potential sale into interstate commerce. Khazanov already had incorporated a business and planned to build an art gallery in order to sell his paintings. Verbitskaya twice offered to help Khazanov sell his paintings and that was indeed his intention on the day of the extortion. Thus, under the first prong of the *Collins* test, Khazanov was directly engaged in interstate commerce, and the loss of the paintings directly depleted his assets.

Under the third theory, the district court permitted the jury to find an effect

---

[10]Despite the fact that the *Diaz* court used this test, we have continued to stress a fact-specific inquiry into the directness and likely extent of any impact on interstate commerce. 248 F.3d at 1084-85. Only eight months after *Diaz* was published, this Court decided *United States v. Carcione*, 272 F.3d 1297, 1301 n.6 (11th Cir. 2001), which reiterated our long-standing precedent that "in determining whether there is a minimal effect on commerce, each case must be decided on its own facts," thereby rejecting "restrictive" reliance on the *Collins* test.

on interstate commerce if it found that the money extorted by the appellants was transferred to Khazanov from out-of-state insurance companies. Verbitskaya argues that this theory was insufficient because once Khazanov deposited his money into a personal bank account, the funds lost any previous interstate character. Extortion of money obtained in interstate commerce affects interstate commerce. *See United States v. Fabian*, 312 F.3d 550, 556 (2d Cir. 2002) (holding that a "robbery that specifically targets a large, discreet sum of money derived from interstate commerce affects interstate commerce"); *see also United States v. Mills*, 204 F.3d 669, 672 (6th Cir. 2000) (in an extortion case, the requisite effect on interstate commerce is met where a "realistic probability that bribe money would be borrowed from a company engaged in interstate commerce" was shown and the defendant had "actual knowledge of the interstate character of the funds"). Here, Verbitskaya had actual knowledge that Khazanov had received a large discreet sum of money from out-of-state insurance companies. In fact, the amount he was told to wire to the Swiss account was the same amount she had learned he retained from the settlement. Thus, the third theory was legally sufficient.

Under the final theory, Verbitskaya argues that the fact that Khazanov kept his money in a bank with interstate ties does not mean that the attempted extortion affected interstate commerce. Verbitskaya's argument is misplaced. The district

12

court did not charge that the government could prove an effect on interstate commerce simply by proving that the bank had ties to interstate commerce; rather, the court instructed that the jury could convict if Khazanov's own bank account was "used to do business outside the state of Florida." *See United States v. Bengali*, 11 F.3d 1207, 1212 (4th Cir. 1993) (concluding that an extortion scheme affected intestate commerce when "money . . . used to pay . . . extortioners came from a bank account used by a business engaged in interstate and foreign commerce"). Khazanov used his bank account to start his business which involved payments to contacts outside Florida. Thus, he was directly engaged in out-of-state business and the fourth theory was legally sufficient.

We conclude that all four theories were legally sufficient. Under *Griffin*, a general verdict given by a trial court can be sustained if none of the possible theories submitted to the jury were legally erroneous. 502 U.S. at 58-59. Therefore, the district court's instructions did not violate the commerce clause.

Finally, Verbitskaya argues that the district court committed plain error by failing to require a unanimous verdict on the government's four alternative theories on how interstate commerce was affected by the extortion in this case. The district court did not require the jury to agree unanimously on which theory or theories it was relying for its verdict. Though Verbitskaya did not request a special

13

unanimity instruction, Verbitskaya claims that the district court's failure to issue the instruction *sue sponte* deprived her of her Sixth Amendment right to a unanimous jury and was plain error under Fed.R.Crim.P. 52(b). In support of this contention, she cites to *United States v. Gipson*, 553 F.2d 453, 458 (5th Cir. 1977), which held that where entirely different alternative conceptual groupings and facts are alleged to support a single crime, the Sixth Amendment requires unanimity regarding the specific theory relied upon by the jury to reach its verdict and the district court must instruct the jury that it must unanimously agree on which theory and which specific factual actus reus supports the verdict.

*Gipson* was discredited by the Supreme Court's 1991 decision in *Schad v. Arizona*, 501 U.S. 624, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991).[11] In *Schad*, the Supreme Court noted: "[w]e are not persuaded that the *Gipson* approach really answers the question, however. Although the classification of alternatives into 'distinct conceptual groupings' is a way to express a judgment about the limits of permissible alternatives, the notion is too indeterminate to provide concrete guidance to courts faced with verdict specificity questions." 501 U.S. at 635; *see also United States v. Sanderson*, 966 F.2d 184, 187 (6th Cir. 1992) (stating that

---

[11]In *Schad*, the Supreme Court held that a conviction under instructions that did not require the jury to agree on one of the alternative theories of premeditated and felony-murder did not deny due process. 501 U.S. at 644-45.

*Schad* rejected the *Gipson* analysis).[12]  Therefore, we do not follow the *Gipson* approach in this case and we conclude that the district court did not need to instruct the jury to unanimously agree on which theory supported the verdict.

### B.

We now turn to Verbitsky's seven arguments made on appeal.  First, he argues that there was insufficient evidence presented to support the jury's verdict.  Whether sufficient evidence was presented at trial to support Verbitsky's Hobbs Act convictions is a question of law subject to *de novo* review.  *United States v. Keller*, 916 F.2d 628, 632 (11th Cir. 1990).  We review the sufficiency of the evidence to determine whether a reasonable jury could have concluded that the evidence established Verbitsky's guilt beyond a reasonable doubt.  The evidence is viewed in the light most favorable to the government and all reasonable inferences and credibility choices are made in the government's favor.  *United States v. Carcione*, 272 F.3d 1297, 1300 (11th Cir. 2001); *United States v. Johnson*, 713

---

[12]Verbitskaya claims that the Supreme Court did not completely overrule *Gipson* by arguing that two Eleventh Circuit decisions make clear that *Gipson* is still valid and binding.  Verbitskaya cites to *United States v. Bobo*, 344 F.3d 1076 (11th Cir. 2003) and *United States v. Adkinson*, 135 F.3d 1363 (11th Cir. 1998).  In *Bobo*, the court relied upon *Gipson* in reversing a conviction for the district court's failure to require the "jury to unanimously agree on which overt act" constituted the alleged criminal scheme.  344 F.3d at 1085.  In *Adkinson*, this court relied upon *Gipson* to find that the district court committed plain error in failing to *sua sponte* instruct the jury that they must unanimously agree on which scheme constituted bank fraud.  135 F.3d at 1377-78.  Both of these cases, however, concerned claims by the defendants that the language of the charging count in the *indictment* was insufficient.  The issue of whether the indictment was sufficient was not present in this case.

15

F.2d 654, 661 (11th Cir. 1983).

Verbitsky first argues that there was insufficient evidence to prove that he was involved in a conspiracy with his former wife to plot and to conspire to extort from Khazanov his valuable possessions and a large sum of money. "To prove a Hobbs Act conspiracy under 18 U.S.C. § 1951, the government must prove that (1) two or more persons agreed to commit a robbery or extortion encompassed within the Hobbs Act; (2) the defendant knew of the conspiratorial goal; and (3) the defendant voluntarily participated in helping to accomplish the goal." *United States v. Pringle*, 350 F.3d 1172, 1176 (11th Cir. 2003). A Hobbs Act conspiracy can be proved by showing a *potential impact* on interstate commerce. *See United States v. Farrell*, 877 F.2d 870, 875 (11th Cir. 1989) (conspiracy established by proof of a potential impact on interstate commerce in an extortion-kidnapping plot).

Khazanov and Petrounina's testimony at trial established that Verbitsky was involved in a conspiracy with Verbitskaya to commit extortion. The testimony showed that Verbitsky and Verbitskaya planned to extort money from Khazanov by luring him to Verbitskaya's condominium with his paintings and then forcing him to sign faulty receipts and to agree to wire money to Verbitsky's Swiss bank account. In order to accomplish this, Verbitsky stabbed Khazanov with a knife, hit

16

him in the spine with a golf club and threatened to have his mother and daughter raped. Verbitskaya knew of the settlement award that Khazanov had received from his wife's death, and Verbitsky took advantage of this information in order to extort the money from Khazanov. Thus, all three elements of conspiracy were met here.

Verbitsky also challenges his conviction for extortion under the Hobbs Act. He avers that the evidence presented at trial did not support the jury's verdict. In contrast to Verbitskaya's claim, Verbitsky concedes that under Eleventh Circuit precedent, in order to prove a Hobbs Act violation where extortion occurs, the government only needs to prove that the extortion had a "minimal effect" on interstate commerce. *United States v. Woodruff*, 296 F.3d 1041, 1049 (11th Cir. 2002). Nevertheless, Verbitsky claims that the government did not meet even this minimal burden. For support, he cites to *United States v. Frost*, 77 F.3d 1319, 1320 (11th Cir. 1996) (*modified on other grounds*, 139 F.3d 856 (11th Cir. 1998)) in which the court held that extortion of a city council member, even though the city council itself affected commerce, would not have a minimal effect on interstate commerce.

The *Frost* case is distinguishable from the case *sub judice*. In *Frost*, there was no evidence "that the resignation of one member of a six-member city council

17

would have impacted the continuing business of that governing body." *Id.* at 1320. In contrast, here Verbitsky's extortion of Khazanov directly affected Khazanov's ability to sell his paintings through interstate commerce and use his money for his Russian dance business. *See* discussion *infra* Part A. Thus, the government submitted sufficient evidence to prove a minimal effect on interstate commerce.

Second, Verbitsky argues that the indictment should have been dismissed due to presentation of false testimony to the grand jury and that therefore, his convictions must be vacated. We reverse a grand jury indictment when the error "substantially influenced the grand jury's decision to indict, or [when] there is grave doubt that the decision to indict was free from such substantial influence of such violations." *United States v. Vallejo*, 297 F.3d 1154, 1165 (11th Cir. 2002).[13]

Verbitsky contends that Khazanov's testimony that he had never had a sexual relationship with Verbitskaya substantially influenced the grand jury's decision to indict Verbitsky and Verbitskaya. We conclude that Khazanov's false testimony concerned a collateral matter, not the facts of the defendant's extortion.[14]

---

[13]Additionally, false testimony before the grand jury justifies dismissal of an indictment if the false testimony results from "prosecutorial misconduct" that causes prejudice to the defendant. *Bank of Nova Scotia v. United States*, 487 U.S. 250, 251, 108 S.Ct. 2369, 2371, 101 L.Ed.2d 228 (1998). When Khazanov testified in front of the grand jury the prosecution did not know that this testimony was false. As soon as the government became aware of the false testimony, the perjury was brought to the attention of the court.

[14]Moreover, Khazanov admitted at trial that he had lied about his relationship with Verbitskaya and was cross-examined extensively on the subject.

Therefore, there was not a substantial likelihood that the grand jury was unduly influenced by Khazanov's testimony.

Verbitsky's third argument is that the prosecution engaged in misconduct during trial. During opening arguments at trial, the prosecutor revealed to the jury that Verbitsky had told the police when they came to arrest him that he was "one of them" and "part of the Russian mob." Verbitsky claims that this was a misstatement of what would be said later at trial.

The defense did not contemporaneously object to this statement at trial. Thus, we review the propriety of the government's statement for plain error. *United States v. Newton*, 44 F.3d 913, 920 (11th Cir. 1995). An error is plain only if it is clear and obvious and affects a defendant's substantial rights. *Johnson v. United States*, 520 U.S. 461, 467, 117 S.Ct. 1544, 1549, 137 L.Ed.2d. 718 (1997).

A government witness did later testify that Verbitsky made the statement "I am one of you," referring to the mob, when the police knocked on his door. Therefore, we conclude that the prosecutor's statement does not rise to the level of plain error.

Verbitsky also claims that the prosecutor vouched for his witness during opening arguments when he told the jury that Khazanov had lied at the indictment but would tell them the truth at trial. The prosecutor said in his opening statement

19

that Khazanov would now tell the jury the truth about his previous relationship with Verbitskaya. After the defense objected to this assertion, the court explained to the jury that "a lawyer cannot vouch for his witness at this point." Then the prosecutor rephrased his statement and told the jury that Khazanov would admit to having an affair with Verbitskaya.

In reviewing this claim of prosecutorial misconduct, which was preserved for appeal, we assess (1) whether the challenged comments were improper and (2) if so, whether they prejudicially affected the substantial rights of the defendant. *United States v. Castro*, 89 F.3d 1443, 1450 (11th Cir. 1996). The prosecutor's comments were not based on personal opinion but upon the evidence he expected to, and did in fact, present at trial. Thus, we conclude that the comments did not prejudicially affect Verbitsky's substantial rights.

Verbitsky further contends that the prosecutor's comments during closing arguments rise to the level of plain error. Verbitsky points to comments the prosecutor made again about Verbitsky's connections with the Russian mafia, comments about how Khazanov was forced to record a statement declaring that he raped Verbitskaya, and references to Verbitsky's failure to testify.[15] Verbitsky did not object to these comments at trial, and therefore we review them for plain error.

---

[15]The prosecutor specifically said, "Can the defense explain these things? We have."

20

*Newton*, 44 F.3d at 920.

Upon review of the record, we conclude that (1) the references to Khazanov's recorded statement merely commented on the evidence presented to the jury; (2) the references to the Russian mob were not in error because a government witness testified that Verbitsky had yelled to the police that he was "one of them" referring to the Russian mob; and (3) it was not plain error for the prosecutor to point out that the defense did not give an innocent explanation in light of the evidence of his guilt. *See United States v. Delgado*, 56 F.3d 1357, 1368 (11th Cir. 1995) ("a defendant's fifth amendment privilege is not infringed by a comment on the failure of the defense, *as opposed to the defendant*, to counter or explain the testimony presented or evidence introduced").

Fourth, Verbitsky claims that the district judge's interruptions of the defense created an air of partiality which denied him the right to a fair and impartial trial. We review a district judge's conduct during trial for abuse of discretion. *See United States v. Cox*, 664 F.2d 257, 259 (11th Cir. 1981). "[I]n order to amount to reversible error, a judge's remarks must demonstrate such pervasive bias and unfairness that they prejudice one of the parties in the case." *United States v. Ramirez-Chilel*, 289 F.3d 744, 750 n.6 (11th Cir. 2002). Upon review of the record, we conclude that the interruptions by the court did not show bias and were

21

within the court's discretion. We further conclude that they were necessary to help to maintain the pace of the trial. Finally, we note that the court instructed the jury that comments of the court did not reflect the court's opinion concerning any of the issues in the case. Thus, Verbitsky was not denied the right to an impartial trial.

Fifth, Verbitsky argues that his counsel was ineffective. Except in the rare instance when the record is sufficiently developed, we will not address claims for ineffective assistance of counsel on direct appeal. *United States v. Tyndale*, 209 F.3d 1292, 1294 (11th Cir. 2000). In this case, the record is sufficiently developed to permit us to reject Verbitsky's claim.

In *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the United States Supreme Court established the following two-part test to show ineffective assistance of counsel that violates the Sixth Amendment: (1) "the defendant must show that counsel's performance was deficient," defined as "representation [that] fell below an objective standard of reasonableness;" and (2) "the defendant must show that the deficient performance prejudiced the defense" by demonstrating "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *See also Turner v. Crosby*, 339 F.3d 1247, 1275 (11th Cir. 2003).

Verbitsky contends that he was denied effective counsel when his "lead

22

counsel" was absent the day of the closing argument. At trial, Verbitsky was represented by Albert Dayan and Reemberto Diaz. Dayan gave the opening argument in the case and was planning to give the closing argument. Diaz argued may of the motions and performed the majority of the cross-examination. Dayan was absent the day of the closing, and *upon agreement from Verbitsky*, the court allowed Diaz to present the closing argument. Moreover, early on in the trial, Dayan told the judge that Diaz was "a seasoned attorney" and the Diaz had "much more experience" than he did. Thus, Dayan's absence during closing arguments did not fall below an objective standard of reasonableness.

Verbitsky also asserts that trial counsel was ineffective for failing to call Natalie Policolo as an "expert" in "international business type work." Verbitsky's counsel proffered that she would testify about "how in international transactions people give each other the bank account numbers, how it is one of the most relevant things in any negotiation." The district court ruled that based on that proffer Ms. Policolo could not testify at trial but that the defense could seek reconsideration based on a further proffer. Verbitsky claims that he received ineffective counsel when no further proffer was made by his attorneys. He does not establish, however, what further proffer could have been made, nor does he establish how, but for this omission, the result of the proceedings would have been

23

different. Thus, we conclude that Verbitsky's Sixth Amendment right to counsel was not violated.

Sixth, Verbitsky argues that the district court improperly instructed the jury regarding the possible means by which the extortion may have affected interstate commerce. As we discussed at length earlier, the judge properly instructed the jury. *See* discussion *infra* Part A.

Verbitsky's final argument is that the district court erred in imposing an enhancement for use of a firearm, pursuant to section 2B3.2(b)(3) of the United States Sentencing Guidelines ("U.S.S.G."). Verbitsky notes that officers did not find a firearm at Verbitskaya's condominium and that Khazanov did not indicate that a handgun was used in the commission of the offense when he first reported the incident to officials. Verbitsky also argues that, even if the existence of the weapon was proven, there was insufficient evidence to support a six-level enhancement, because the firearm was not "otherwise used" during the incident. He claims that there was no direct testimony or evidence that the weapon was pointed at Khazanov.

Section 2B3.2 calls for an increase of seven offense levels if a firearm was discharged during the course of extortion by force or threat, an increase of six levels if a firearm was "otherwise used," and an increase of five levels if a firearm

24

was "brandished or possessed." U.S.S.G. § 2B3.2(b)(3)(A) (2002). A firearm was brandished if "all or part of the weapon was displayed, or the presence of the weapon was otherwise made known to another person, in order to intimidate that person . . . ." U.S.S.G. § 1B1.1., comment. (n.1(c)) (2002). A firearm was "'otherwise used' . . . if the conduct did not amount to the discharge of a firearm but was more than brandishing, displaying, or possessing a firearm . . ." U.S.S.G. § 1B1.1, comment. (n.1(f)) (2002).

We addressed the difference between merely brandishing and otherwise using a firearm in *United States v. Cover*, 199 F.3d 1270, 1278 (11th Cir. 2000), holding that "the use of a firearm to make an explicit or implicit threat against a specific person constitutes 'otherwise use' of the firearm." Here, Khazanov's testimony at trial established that Verbitsky beat him with a golf club, punched him with a knife, and threatened to have his daughter raped. Khazanov further testified that Verbitsky then grabbed a handgun from behind his back and told Khazanov that, if Khazanov did not follow through with sending the demanded money to Switzerland, Verbitsky and Verbitskaya would shoot him. Furthermore, Officer Marcy Stone, of the Miami-Dade Police Department, testified that, on the night when Khazanov reported the incident to the authorities, she heard "the rack of a gun" as she waited for assistance from other officers outside of Verbitskaya's

25

condominium.  We conclude that the district court was within its discretion to find that Verbitsky used the firearm to make an explicit threat.

Finally, we note that subsequent to filing his initial brief on appeal, Verbitsky submitted supplemental authority raising the Supreme Court's decision in *Blakely v. Washington*, 542 U.S. __, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004).[16] In this submission, Verbitsky claimed that the *Blakely* decision "impacts his case in that it applies to [his firearm enhancement claim] and any other enhancements that were given at sentencing."  We granted the government's motion to strike this supplemental authority from the record.  Following oral argument in this case, the Supreme Court decided *United States v. Booker*, 543 U.S. __, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005),[17] which Verbitsky soonafter submitted to us as supplemental authority.  In *United States v. Nealy*, 232 F.3d 825, 830 (11th Cir. 2000) we stated:

> Parties must submit all issues on appeal in their initial brief . . . When new authority arises after a brief is filed, this circuit permits parties to submit supplemental authority on "*intervening* decisions or *new* developments" regarding issues already properly raised in the initial briefs . . . Also, parties

---

[16]In *Blakely*, the Supreme Court applied the rule set out in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and held that because the facts supporting the trial court's imposition of a greater sentence were neither admitted by the petitioner nor found by a jury, the sentence imposed above the range indicated in the State of Washington's Sentencing Reform Act violated Blakely's Sixth Amendment right to a fair trial.

[17]In *Booker*, the Supreme Court held that the Sixth Amendment right to trial by jury is contravened when the sentencing court, acting under the mandatory Guidelines, imposes a sentence greater than the maximum sentence authorized by the facts that were found by the jury alone.  125 S.Ct. at 749-56.

can seek permission of the court to file supplemental briefs on this new authority . . . . But parties cannot properly raise new issues at supplemental briefing, even if the issues arise based on the intervening decisions or new developments cited in the supplemental authority.

(internal citations omitted) (emphasis in original). We reiterated this principle in *United States v. Levy*, 379 F.3d 1241, 1242 (11th Cir. 2004), when we said that we would not entertain Levy's *Blakely* claim raised in his petition for rehearing "because Levy did not timely raise it in his initial brief on appeal."[18] Similarly, in *United States v. Shelton*, 400 F.3d 1325, 1330 n.5 (11th Cir. 2005), we reviewed petitioner Shelton's *Blakely/Booker* claim on appeal because he timely raised the issue in his initial brief. We noted in a footnote, however, that Shelton's case was distinguishable from the case of petitioners who "default[], waive[], or abandon[] at the appellate stage the *Apprendi*, *Blakely*, or *Booker* issues." *See also United States v. Ardley*, 242 F.3d 989, 990 (11th Cir. 2001) (stating that "we apply our well-established rule that issues and contentions not timely raised in the briefs are

---

[18]In *Griffith v. Kentucky*, 479 U.S. 314, 328, 107 S.Ct. 708, 716, 93 L.Ed.2d 649 (1987) the United States Supreme Court concluded that "a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases . . . pending on direct review or not yet final." The *Griffith* holding, however, applies only to defendants who preserved their objections throughout the trial and appeals process. 479 U.S. at 316-20; *see also United States v. Levy*, 391 F.3d 1327 (11th Cir. 2004) (denial of rehearing en banc) ("The *Griffith* Court did not require . . . that a dissimilarly situated defendant-one who did not preserve his objection [below or on appeal]-would somehow benefit from the retroactive application of [a new Constitutional ruling]."). We also note that the Supreme Court has recognized that the retroactivity rule is "subject, of course, to established principles of waiver, harmless error, and the like." *Shea v. Louisiana*, 470 U.S. 51, 58 n.4, 105 S.Ct. 1065, 1069 n.4, 84 L.Ed.2d 38 (1985).

27

deemed abandoned.").  Thus, we decline to address this issue because it is a completely new issue which Verbitsky is seeking to raise for the first time in a supplemental filing.

## III.

Upon review of the record, and upon consideration of the briefs of the parties, we find no reversible error.  Accordingly, we **AFFIRM** the decision of the district court.