[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-11339
Non-Argument Calendar

_____

D.C. Docket No. 3:17-cr-00225-TJC-MCR-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

HERACLIO GUTIERREZ,
a.k.a. HECTOR,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(April 21, 2020)

Before WILLIAM PRYOR, ROSENBAUM, and JILL PRYOR, Circuit Judges.

PER CURIAM:

After a jury trial, Heraclio Gutierrez was convicted of conspiracy to distribute methamphetamine, in violation of 21 U.S.C. § 846, and sentenced to 200 months in prison. He appeals, challenging his conviction and sentence. After careful review, we affirm.

**I.**

Dustin Whittaker was a user and distributor of methamphetamine. Looking for a better source of supply, Whittaker was put in touch with a man in Texas named "Hector," whom Whittaker identified as Gutierrez at trial. At first, Whittaker drove to Austin, Texas, to buy methamphetamine from Gutierrez.

Later, Gutierrez arranged for a courier to transport larger quantities of methamphetamine by vehicle to Whittaker in Jacksonville, Florida. In June 2017, courier Luisana Ramirez-Chavez arrived in Jacksonville with approximately ten pounds of methamphetamine, which was hidden within a compartment on the underside of the vehicle. Gutierrez drove to Jacksonville to oversee the delivery. In August 2017, Gutierrez arranged for Ramirez-Chavez to deliver another shipment of methamphetamine. Gutierrez again drove from Austin to oversee the delivery. This time, Whittaker removed around twelve pounds of methamphetamine from the vehicle. Whittaker stored most of the second shipment in a storage unit.

On August 14, 2017, Matthew Yarborough, a special agent with the Florida Department of Law Enforcement, received information from a confidential source

2

that Whittaker had just received a large shipment of methamphetamine that he had placed in his storage unit.  After confirming with management that Whittaker rented the storage unit in question, Yarborough asked an officer and his drug-detection dog to conduct an exterior sniff of several units in that area.  The dog alerted to Whittaker's storage unit.

Yarborough then applied for, obtained, and executed a search warrant for the storage unit.  In the unit, law enforcement officers found a duffel bag containing multiple packages of suspected methamphetamine.  They seized the packages, and Yarborough left a copy of the search warrant.  Whittaker found the search warrant the next day, after discovering that the methamphetamine had been taken. Whittaker then spoke with Yarborough and agreed to cooperate with the investigation.  He testified for the government at Gutierrez's trial.

Based on information Whittaker provided, Yarborough was able to identify Gutierrez as Whittaker's source of supply.  Further investigation revealed that Gutierrez and coconspirator Mitchell Loor, who was involved in the earlier two shipments, were planning to have another methamphetamine shipment transported to Jacksonville by Ramirez-Chavez.  Law-enforcement officers intercepted Ramirez-Chavez en route to Jacksonville in October 2017, and a drug-detection dog alerted to the presence of drugs in the car.  The car, which Gutierrez and Loor had purchased in late August, was taken to a shop for further investigation and found to

3

contain over five kilograms of methamphetamine.  Ramirez-Chavez testified at trial about the deliveries and her interactions with Gutierrez.

The government called two forensic chemists employed by the Drug Enforcement Administration ("DEA") to testify as experts regarding the substances recovered.  Tyrone Shire testified that the October shipment contained 5,167 grams of 98% pure methamphetamine.  Jose Conde testified that the packages recovered from the storage unit in August contained 2,185.9 grams of 73% pure methamphetamine.  The district court overruled Gutierrez's objections that Shire and Conde were not qualified to testify as experts under Rules 702 and 705, Fed. R. Evid., and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

The jury returned a verdict finding Gutierrez guilty of a distribution conspiracy involving 500 grams or more of meth.

Gutierrez's presentence investigation report ("PSR") determined that he was accountable for 4.54 kilograms of methamphetamine, based on the ten-pound shipment of unknown purity in July 2017, and 9.03 kilograms of "methamphetamine (actual)," based on the twelve-pound shipment of 73% purity in August and the 5,167-gram shipment of 98% purity in October.[1]  The PSR then converted these

---

[1] "Methamphetamine (actual)" means as the "weight of the controlled substance, itself, contained in the mixture or substance."  U.S.S.G. § 2D1.1(c) n.(B).  To determine the weight of pure methamphetamine, the PSR multiplied the weight of each shipment by its purity percentage. Because the purity of the first shipment was unknown, the PSR treated that quantity as a mixture or substance containing methamphetamine.

amounts to their marijuana equivalents and combined them to derive a single offense level. *See* U.S.S.G. § 2D1.1 cmt. n.8(B). The combined converted drug weight was 189,680 kilograms of marijuana, which corresponded to a base offense level of 38.

Gutierrez objected to the drug-quantity finding and argued that he should be held accountable for only the quantity of methamphetamine recovered from the storage unit. The district court overruled the objection at sentencing. The court found that the drug quantity was supported by trial testimony and that, even if it was exaggerated to some degree, it was still well above the amount necessary to trigger the highest base offense level of 38. The court's rulings resulted in a total offense level of 38 and a corresponding guideline range of 235 to 293 months. The court ultimately sentenced Gutierrez to 200 months in prison. Trial counsel was permitted to withdraw, and new counsel was appointed for appeal. This appeal followed.

## II.

First, Gutierrez argues that his trial counsel was constitutionally ineffective. In Gutierrez's view, trial counsel committed numerous procedural and substantive legal errors, failed to prepare adequately for trial, and gave inadequate guilty plea advice. Gutierrez maintains that the record of counsel's deficiencies is sufficiently developed to resolve these claims on direct appeal.

"Except in the rare instance when the record is sufficiently developed, we will not address claims for ineffective assistance of counsel on direct appeal." *United*

*States v. Verbitskaya*, 406 F.3d 1324, 1337 (11th Cir. 2005).  As the Supreme Court has explained, because the trial record is "devoted to issues of guilt or innocence," it ordinarily will not disclose the facts necessary to judge the reasons for counsel's actions or omissions.  *Massaro v. United States*, 538 U.S. 500, 504–05 (2003).  "Without additional factual development, moreover, an appellate court may not be able to ascertain whether the alleged error was prejudicial."  *Id.* at 505.

For these reasons, "in most cases a motion brought under § 2255 is preferable to direct appeal for deciding claims of ineffective assistance."  *Id.* at 504.  That's true "even if the record contains some indication of deficiencies in counsel's performance."  *Id.*  In a § 2255 proceeding, the "court may take testimony from witnesses for the defendant and the prosecution and from the counsel alleged to have rendered the deficient performance."  *Id.* at 505.  Moreover, the § 2255 motion will often be decided by the same district judge who presided at trial, so the judge will have a better perspective for determining counsel's effectiveness and whether any deficiencies were prejudicial.  *Id.* at 506.

Here, we decline to consider Gutierrez's ineffective-assistance-of-counsel claims on direct appeal because the record is not sufficiently developed.  Although the record contains instances where counsel's inexperience in federal court is apparent, the record is silent on a number of key matters, including counsel's reasons for taking certain actions challenged by Gutierrez and the substance of counsel's

6

advice with respect to a guilty plea. *See id.* at 504–05. Moreover, without further factual development and the benefit of the trial judge's perspective, we are not in a position at this time to thoroughly analyze counsel's performance and determine whether any deficiencies in counsel's performance were prejudicial. *See id.* at 506. Gutierrez is free to raise these claims in a 28 U.S.C. § 2255 motion.

## III.

Second, Gutierrez contends that the district court erred by overruling his objections to Agent Yarborough's description of statements made to him by a confidential source. Specifically, Yarborough explained that the investigation into the drug conspiracy began when a confidential source informed him that Whittaker had taken her to his storage unit and, after asking her "what's the most meth that you ha[ve] ever seen," told her he had just deposited approximately twelve pounds of methamphetamine. Gutierrez argues that this testimony was hearsay within hearsay and that it violated his rights under the Confrontation Clause.

We review evidentiary rulings for an abuse of discretion. *United States v. Cooper*, 926 F.3d 718, 730 (11th Cir.), *cert. denied*, 140 S. Ct. 613 (2019). We review unpreserved Confrontation Clause challenges for plain error only. *United States v. Jiminez*, 564 F.3d 1280, 1286 (11th Cir. 2009).

The Confrontation Clause, which provides that a defendant has the right to be confronted with the witnesses against him, "only applies to testimonial statements,

specifically testimonial hearsay." *United States v. Curbelo*, 726 F.3d 1260, 1272 (11th Cir. 2013) (quotation marks omitted). Hearsay is an out-of-court statement offered in evidence to prove the truth of the matter asserted. Fed. R. Evid. 801(c). Hearsay within hearsay is admissible only if each part of the combined statements conforms with an exception to the hearsay rule. Fed. R. Evid. 805.

If a statement is not offered for its truth, however, it's not hearsay and does not violate the Confrontation Clause. *Jiminez*, 564 F.3d at 1287; *see Curbelo*, 726 F.3d at 1272 ("The Confrontation Clause only applies to testimonial statements that are used to establish the truth of the matter asserted." (quotation marks omitted)). And "this Circuit has long recognized that [s]tatements by out of court witnesses to law enforcement officials may be admitted as non-hearsay if they are relevant to explain the course of the officials' subsequent investigative actions," provided the "probative value of the evidence's non-hearsay purpose is not substantially outweighed by the danger of unfair prejudice caused by the impermissible hearsay use of the statement." *Jiminez*, 564 F.3d at 1288 (quotation marks omitted).

Here, Yarborough's testimony about the cooperating source's out-of-court statements that Whittaker had methamphetamine in his storage unit was admissible as non-hearsay because Yarborough was explaining how the investigation of the drug conspiracy began. *See id.* The statements—including the cooperating source's description of Whittaker's comments to her—were relevant to explain subsequent

8

investigative actions. *See id.*; Fed. R. Evid. 805. And the probative value of the statements was not substantially outweighed by the danger of unfair prejudice because Yarborough further explained how he verified the cooperating source's statements. *See Jiminez*, 564 F.3d at 1288. Because the statements were not offered for their truth, they were not hearsay and did not violate the Confrontation Clause.

But even assuming the district court erred, any error was harmless beyond a reasonable doubt. *See Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986) (Confrontation Clause errors do not warrant reversal if they are "harmless beyond a reasonable doubt"). Whittaker testified about these matters, explaining that he received via a courier a twelve-pound shipment of methamphetamine, which he then placed in his storage unit. And evidence established that nearly five pounds of methamphetamine was found during a search of that unit, which Yarborough confirmed was leased to Whittaker. So the cooperating source's statements, which did not identify or implicate Gutierrez, were merely cumulative of other evidence and of little importance to the government's case. *See id.*

## IV.

Third, Gutierrez argues that the government failed to prove the reliability of the methodology used by the government's two forensic chemistry experts, Shire and Conde, who testified as to the nature, weight, and purity of the substances recovered from the storage unit in August 2017 and the car in October 2017. In

9

Gutierrez's view, the district court abused its discretion by allowing these witnesses to testify as experts because they could not answer "vital reliability questions regarding the methodology and the machines that actually performed the testing."

We review the district court's decisions regarding the admissibility of expert testimony and the reliability of an expert opinion for an abuse of discretion. *United States v. Barton*, 909 F.3d 1323, 1330 (11th Cir. 2018). "This abuse-of-discretion standard recognizes the range of possible conclusions the trial judge may reach, and thus affords the district court considerable leeway in evidentiary rulings." *Id.* (citation and quotation marks omitted). We must affirm the district court unless it has applied the wrong legal standard or made a clear error of judgment that resulted in substantial prejudice to the defendant. *Id.* at 1330–31.

Rule 702 of the Federal Rules of Evidence governs the admission of expert testimony.[2] Fed. R. Evid. 702. The district court is the gatekeeper for expert testimony and is tasked with ensuring that expert testimony is sufficiently reliable

---

[2] Rule 702 states in full,

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

and relevant to be considered by the jury. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147–48 (1999). The Supreme Court in *Daubert* listed four factors for determining whether expert testimony is sufficiently reliable for admission under Rule 702. *Daubert*, 509 U.S. at 592–94. They include the following: (1) whether the expert's methodology can be and has been tested; (2) whether it has been subjected to peer review and publication; (3) what its known or potential rate of error is, and whether standards controlling its operation exist; and (4) whether it is generally accepted in the field. *Id.*

Nevertheless, the inquiry is "flexible," and *Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case. *United States v. Brown*, 415 F.3d 1257, 1267 (11th Cir. 2005). Whether the *Daubert* factors are relevant to "assessing reliability in a given case will depend[] on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Id.* at 1268 (quotation marks omitted). So expert testimony that does not meet all or most of the *Daubert* factors may sometimes be admissible. *Id.*

In *Brown*, for example, we upheld the admission of expert testimony that met only the "general acceptance" *Daubert* factor. *Id.* at 1267. The experts in *Brown* "conceded that their method and conclusions were not quantitative or testable by the scientific method," but were instead "based on visual comparisons of the molecular models combined with expert knowledge of chemistry." *Id.* Moreover, "[t]he

11

government produced no papers or studies in which the methodology or opinions of [the experts] were subjected to peer review." *Id.* But because the district court credited testimony that the experts' method was generally accepted, we concluded that, in light of the flexible nature of the gatekeeping inquiry, the court did not abuse its discretion in admitting their expert opinions. *Id.* at 1267–68.

The district court did not abuse its discretion in admitting the testimony of the government's experts. Gutierrez does not question the experts' experience or background, but he argues that their testimony was unreliable because they did not know the rate of error regarding the techniques they used and were unable to identify any experts or studies that supported or discredited the methods they used. But as we have explained, expert testimony does not necessarily need to meet all or most of the *Daubert* factors to be admissible. *Id.*

And here, as in *Brown*, the "general acceptance" *Daubert* factor was met. Shire testified that the various techniques he and Conde used in the DEA labs to identify substances—including gas chromatography, mass spectrometry, and infrared spectroscopy—were "commonly used in the industry for identifying compounds." The district court was permitted to credit this testimony that the experts' testing methods were generally accepted and to conclude that the methods were, therefore, sufficiently reliable to be considered by the jury. *See id.* The reliability of the expert testimony was further supported by Shire's testimony that

12

DEA chemists employed "multiple testing using a variety of techniques," as well as testing multiple samples of the substance, which provided multiple results that could be compared with "authenticated reference materials from an outside source" and which permitted identification with confidence.  Given the flexible nature of the gatekeeping inquiry, Gutierrez has not shown that the court abused its discretion in admitting the expert testimony as to the nature, purity, and weight of the substances. *See id.*

## V.

Next, Gutierrez challenges the district court's determination of drug quantity at sentencing.  He argues that the drug-quantity finding was not supported by a preponderance of the evidence and that the court failed to determine whether the drugs attributed to him were reasonably foreseeable.

We review for clear error a district court's determination of the drug quantity attributable to a defendant.  *United States v. Almedina*, 686 F.3d 1312, 1315 (11th Cir. 2012).  "The district court's factual findings for purposes of sentencing may be based on, among other things, evidence heard during trial, undisputed statements in the PS[R], or evidence presented during the sentencing hearing."  *United States v. Polar*, 369 F.3d 1248, 1255 (11th Cir. 2004).

The base offense level for a conspiracy drug offense is ordinarily calculated by determining the quantity of drugs attributable to a defendant.  U.S.S.G.

§ 2D1.1(a).  To determine that quantity, the district court must consider "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant."  U.S.S.G. § 1B1.3(a)(1)(A).  Additionally, "[i]n the case of a conspiracy, the district court must consider all acts by other participants that were both reasonably foreseeable and in furtherance of the conspiracy."  *United States v. Ryan*, 289 F.3d 1339, 1348 (11th Cir. 2002); *see* U.S.S.G. § 1B1.3(a)(1)(B).

A defendant's base offense level is 38, the highest level available, if the offense involved more than 90,000 kilograms of converted drug weight.  U.S.S.G. § 2D1.1(c)(1).  The same base offense level applies if the offense involves 4.5 kilograms or more of methamphetamine (actual).  *Id.*

Here, the district court did not clearly err in holding Gutierrez accountable for the drug quantity calculated in the PSR.  Trial testimony established that Gutierrez personally directed the three drug shipments that were used to calculate that drug quantity.[3]  *See* U.S.S.G. § 1B1.3(a)(1)(A).  In other words, the base offense level was based solely on conduct with which Gutierrez was directly involved.  So the court did not need to consider whether he was also accountable for the reasonably foreseeable acts of others.  *See Ryan*, 289 F.3d at 1348.  In any case, the three drug

---

[3] Gutierrez suggests that chain-of-custody issues undermined the government's drug-quantity evidence, but the district court overruled his objections at trial, and he does not challenge those rulings on appeal.

shipments plainly were reasonably foreseeable to Gutierrez because he orchestrated them.

Further, the drug amounts involved in each of the shipments were supported by trial testimony from Whittaker and the government's experts. Whittaker testified that the shipments in July 2017 and August 2017 involved ten pounds of methamphetamine and twelve pounds of methamphetamine, respectively. And the government seized 5,167 grams of 98% pure methamphetamine—or 5.06 kilograms of methamphetamine (actual)—from Ramirez-Chavez's car in October 2017. That shipment alone would have qualified Gutierrez for the highest base offense level of 38. *See* U.S.S.G. § 2D1.1(c)(1) (base offense level 38 for 4.5 kilograms or more of methamphetamine (actual)). And combined with the other shipments, and even assuming the earlier amounts were overstated to some degree, the drug quantity involved in Gutierrez's offense was clearly sufficient to qualify him for level 38. *See id.* We therefore affirm Gutierrez's sentence.

## VI.

Finally, Gutierrez contends that relief is warranted under the cumulative-error doctrine. He asserts that he was deprived of a fair trial due to several factors: (a) the district court's conduct in repeatedly stopping defense counsel from speaking, admonishing counsel, or providing instruction to counsel in the presence of the jury; (b) the court's failure to instruct the jury that it was required to assess the weight of

evidence regarding drug quantity; (c) counsel's ineffectiveness; and (d) the other alleged errors discussed above.[4]

We review the record *de novo* to determine the cumulative effect of any alleged errors. *Cooper*, 926 F.3d at 739. The cumulative-error doctrine provides that an aggregation of non-reversible errors can result in an unfair trial, which calls for reversal. *Id.* We determine whether an error had substantial influence on the outcome of the trial by weighing the whole record and examining the facts, the trial context of the error, and the prejudice thereby created as juxtaposed against the strength of the evidence of the defendant's guilt. *Id.* at 740.

Here, Gutierrez has not established cumulative error warranting a new trial. First, our review of the record shows that the district court acted appropriately and within its discretion. *See United States v. Verbitskaya*, 406 F.3d 1324, 1337 (11th Cir. 2005) ("We review a district judge's conduct during trial for abuse of discretion."). The court demonstrated patience and professionalism in handling what was defense counsel's first federal criminal trial. The court's interruptions and statements did not show bias against counsel and, in the main, were directed towards "maintain[ing] the pace" and structure of the trial. *Id.* Moreover, the court instructed

---

[4] Gutierrez's standalone arguments regarding the jurisdiction of state courts to issue warrants for "ping" data are not properly before us because he raised them for the first time in his reply brief. *See United States v. Coy*, 19 F.3d 629, 632 n.7 (11th Cir. 1994) ("Arguments raised for the first time in a reply brief are not properly before a reviewing court."). Although he addressed these issues in the context of his claims of ineffective assistance of counsel, we decline to reach those claims at this time.

the jury that the interruptions did not reflect its opinions on the case. *See id.* (relying on a similar comment to conclude that the defendant was not denied a fair trial). Accordingly, Gutierrez has not shown that he was prejudiced by the court's conduct.

Second, Gutierrez's chain-of-custody arguments are off the mark. The district court overruled his objections regarding the chain of custody for the drug evidence, and he concedes that "the district court was correct to admit the evidence." *See* Appellant's Br. at 54. Nor did Gutierrez request the instruction he claims the court should have given. And in any case, he was free to explore these matters on cross examination and in arguments to the jury. In short, the court committed no error by proceeding as it did.

Third, Gutierrez's claims of ineffective assistance are not properly before us for review, for the reasons we have explained above.

Finally, Gutierrez has not shown that the district court erred in admitting the hearsay evidence or permitting the government's experts to testify, for the reasons explained above. And "[w]here there is no error or only a single error, there can be no cumulative error." *United States v. Gamory*, 635 F.3d 480, 497 (11th Cir. 2011). The evidence of Gutierrez's guilt was strong, if not overwhelming, and he has failed to show that any single error or combination of errors had a substantial influence on the outcome of the trial. *See Cooper*, 926 F.3d at 739–40. Gutierrez received not a

perfect trial, but a fair one.  *See Van Arsdall*, 475 U.S. at 681 ("[T]he Constitution entitles a criminal defendant to a fair trial, not a perfect one.").

## VII.

In sum, we **AFFIRM** Gutierrez's conviction and sentence for conspiracy to possess 500 grams or more of methamphetamine.[5]

---

[5] Gutierrez's motion for leave to file a supplemental appendix out of time is **GRANTED**. The motion to withdraw as Gutierrez's counsel, filed by appointed attorney Percy A. King, is **GRANTED**.