UNITED STATES of America,
Plaintiff-Appellee,

v.

Roy D. JACKSON, Defendant-Appellant.

No. 83–3745.

United States Court of Appeals,
Eleventh Circuit.

Dec. 19, 1984.

Stuart C. Markman, Tampa, Fla., for defendant-appellant.

John M. Fitzgibbons, Asst. U.S. Atty., Tampa, Fla., for plaintiff-appellee.

Before GODBOLD, Chief Judge, HILL, Circuit Judge, and PECK *, Senior Circuit Judge.

* Honorable John W. Peck, U.S. Circuit Judge for the Sixth Circuit, sitting by designation.

GODBOLD, Chief Judge:

This is a Hobbs Act case, 18 U.S.C. § 1951(a), involving extortion of $5,000 by a bank officer incident to approval of bank financing for a construction project. We affirm the conviction.

The indictment charged the following: Snyder was the owner of Snyder Construction Company, which was engaged in constructing and selling residences in Florida. Snyder had a contract to purchase land for construction of homes. He was unable to complete the purchase because he was in financial difficulties and had a federal tax lien against him. He was turned down for a loan by defendant Jackson, president of a branch bank, and unsuccessfully sought financing elsewhere. He returned to defendant, who advised him to get a partner. Snyder found a partner, Arnold, a well-to-do developer, and the two went together to see defendant. They represented themselves as partners and described their joint venture. Arnold was to apply for the $450,000 line of credit that Snyder had unsuccessfully sought, and this was to be used to buy the land and finance the construction. Snyder was to do the construction. The loan was to be made in Arnold's name. Defendant agreed to recommend the loan, and it was approved. Soon thereafter defendant told Snyder he must pay $5,000, to be paid under the table to unnamed persons. Snyder, Arnold, and Snyder's attorney, notified the FBI.

The $5,000 was delivered to defendant in a sealed envelope by Snyder, who was wired. He brought the envelope to Jackson's office, and in Jackson's presence put it on Jackson's desk. Defendant put the envelope in his desk drawer. Snyder left the office and immediately told FBI agents, who were standing by, that the delivery had been made. Approximately three minutes later the agents confronted defendant in the hallway outside his office, patted him down, and directed him to go into the office. They advised him of his *Miranda* rights. He declined to sign a waiver. The officers had no search warrant. One of the officers told the defendant to "give him the

thing" that Snyder had given him. Jackson opened his desk drawer, retrieved the envelope, and placed it on the desk top. The agents asked him to initial it; he refused, saying he would not sign anything without consulting an attorney. Defendant then stated that he did not know what was in the envelope.

 Motions to suppress the envelope, the $5,000, and the testimony of the agents relating to the seizure were correctly denied. Seizure of the envelope and its contents was permissible to prevent the disappearance or destruction of the evidence. *See U.S. v. Watson*, 669 F.2d 1374 (11th Cir.1982); *U.S. v. Marszalkowski*, 669 F.2d 655 (11th Cir.1982). There was no basis on which to suppress the testimony of the agents relating to the properly-made seizure. Jackson was advised of his *Miranda* rights and declined to sign a waiver. The only post-warning statements made by Jackson were that he would not sign anything without consulting an attorney, and that he did not know what was in the envelope. The first statement was not inculpatory and was not made in response to interrogation but in response to the agents' request to initial the envelope. The second statement was exculpatory and was not the product of interrogation but was volunteered by defendant.

 In the jury trial defendant testified that Snyder had told him that he would be giving him football tickets and video game passes in appreciation for quick processing of the loan. He stated that when Snyder handed him the envelope he thought it contained the tickets and passes, but when the FBI agents entered, took him into custody, and demanded production of the envelope it became apparent to him that Snyder had "done something different" and had not placed tickets and passes in the envelope, so that when he was arrested and denied knowing what was in the envelope he in fact did not know what the envelope contained. On cross-examination the prosecution brought out Jackson's statement to the agents that he did not know what was in the envelope. This post-arrest statement, volunteered immediately

after arrest, was admissible to refute the defendant's contradictory testimony that when he was handed the envelope he thought it contained tickets and passes. *See Anderson v. Charles,* 447 U.S. 404, 100 S.Ct. 2180, 65 L.Ed.2d 222 (1980). Defendant asserts that there was no contradiction between his original statement—that he thought the envelope contained tickets and passes—and his later statement—that he did not know what it contained. This assertion is based upon his testimony describing his subjective and uncommunicated mental process, i.e., that following the appearance of the FBI agents, his arrest, and the demand for the envelope he concluded that Snyder must have done something other than what was promised and thus he did not know what was in the envelope. The prosecution does not lose its right to introduce a contradictory statement because the defendant in direct examination attempts to explain away the contradiction by describing his uncommunicated state of mind in making one of the statements.

■ Defendant contends also that his post-arrest silence—his failure to say that he thought the envelope contained tickets and passes—was improperly used against him. This argument has no merit. On direct examination the defendant attempted to explain why he made the post-arrest statement that he did not know what was in the envelope. He described how, until moments before the utterance was made, he thought he knew what was in the envelope, and he explained why he changed his mind. Defendant himself brought up the fact that he did not state that tickets and passes were in the envelope and gave his explanation for the absence of such a statement. The prosecution was then free on cross-examination to question him about the failure he had described.

■ The government's proof satisfied the Act's jurisdictional requirement that the extortion in some way affect interstate

commerce. That effect need only be minimal, *U.S. v. Summers,* 598 F.2d 450 (5th Cir.1979), and is established in this case under the "depletion of assets" theory. Under that theory, "commerce is affected when an enterprise, which either is actively engaged in interstate commerce or customarily purchases items in interstate commerce, has its assets depleted through extortion, thereby curtailing the victim's potential as a purchaser of such goods." *U.S. v. Elders,* 569 F.2d 1020, 1025 (7th Cir.1978); *see also U.S. v. Sorrow,* 732 F.2d 176 (11th Cir.1984). As part of his construction business Snyder had customarily bought materials and supplies that had traveled in interstate commerce. At the time of the extortion Snyder and Arnold intended as an incident of their construction project to purchase materials and supplies that had traveled in interstate commerce. The extorted payment of $5,000 depleted Snyder's assets and burdened him with an additional cost for continuing his business and therefore affected interstate commerce. That Snyder and Arnold did not go forward with their plans after the extortion was consummated and revealed does not alter the legal consequences in this case where the extortion depleted assets derived from and to be used by a business connected with interstate commerce. *Accord U.S. v. Sorrow,* 732 F.2d 176, 180 (11th Cir.1984); *U.S. v. Elders,* 569 F.2d 1020, 1025 (7th Cir.1978). The depletion of assets theory was covered by the court's generalized instruction on interstate commerce:

> While it is not necessary to prove that the defendant specifically intended to interfere with interstate commerce, it is necessary as to this issue that the government prove that the natural consequences of the acts alleged in the indictment would be to delay, interrupt or adversely affect interstate commerce which means the flow of commerce or business activities between two or more states.[1]

---

1. The court also instructed on the "future project" theory used by the Seventh Circuit in *U.S. v. Staszcuk,* 517 F.2d 53 (7th Cir.), *cert. denied,* 423 U.S. 837, 96 S.Ct. 65, 46 L.Ed.2d 56 (1975):

> You are instructed that you may find the requisite effect upon interstate commerce if you find beyond a reasonable doubt that had the Otter Lake project been built as planned in July, 1983, construction materials and other supplies as described in the indictment

The argument that it makes a legal difference that the loan was to be made in Arnold's name while the extorted funds came from Snyder's bank account is frivolous. The loan was solicited by Snyder. Snyder and Arnold agreed to engage in the joint venture. That they did not execute a formal written agreement until after the extortion demand was made is not determinative. The two men went to the bank together, met with Jackson, discussed the project, told Jackson they were to be partners in the project, and explained that Snyder Construction would be involved because there was no tax lien against it. Snyder had a financial interest in the loan and in the joint venture project. *See U.S. v. Biondo,* 483 F.2d 635 (8th Cir.), *cert. denied,* 415 U.S. 947, 94 S.Ct. 1468, 39 L.Ed.2d 563 (1973).

AFFIRMED.

would have been used by Earl L. Snyder, II, and would have their source of origin outside the State of Florida, and units of the Otter Lake project would have been sold to purchasers from outside the State of Florida by Earl L. Snyder, II.

This instruction was at first objected to by Jackson, but, after changes were made in it was accepted. Its correctness is, therefore, not before us. *Staszcuk* has not been widely followed, and we do not decide in this case whether this circuit will adopt it. Rather we base our decision on the accepted "depletion of assets" principle.