[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-10707
_____

D.C. Docket No. 4:14-cr-00143-WTM-GRS-4

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

WILLIE CLINTON LOVETT,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Southern District of Georgia
_____

(November 23, 2016)

Before TJOFLAT, ROSENBAUM, and ANDERSON, Circuit Judges.

PER CURIAM:

Appellant Willie Lovett, a former officer in the Savannah-Chatham

Metropolitan Police Department ("SCMPD"), who retired after serving as Chief of

Police, was indicted on charges of commercial gambling, conspiracy to obstruct the enforcement of state commercial gambling laws, extortion, and making false statements during an investigation conducted by the Federal Bureau of Investigation ("FBI").  The indictment alleged that, over a fourteen-year period, Randall Roach, who conducted an illegal and swindling gambling operation, paid off Lovett for protection of his scheme and to avoid arrest.  Following a five-day trial, Lovett was out of aces.  A jury found him guilty of commercial gambling, conspiracy to obstruct enforcement of state gambling laws, two counts of extortion, and two counts of making false statements.

Lovett now appeals his conviction, contending that the government did not present evidence sufficient for the jury to find him guilty of the counts charged. Lovett also argues that, before the trial began, the government used its peremptory challenges to improperly strike African-American jurors, in violation of *Batson v. Kentucky,* 476 U.S. 79, 106 S. Ct. 1712 (1986).  Finally, Lovett asserts that the district court improperly applied a six-level enhancement when it sentenced him to a term of ninety months in prison.  We find no reversible error and affirm.

## I.    Background

### A.  The Scheme

Lovett was a police officer with SCMPD for forty years and served as its chief from 2010 until he resigned in September 2013.

2

Roach owned and operated the Magic Midway carnival, which traveled throughout Georgia and South Carolina. For celebrations surrounding New Year's Day, Martin Luther King, Jr., Day, and St. Patrick's Day, Roach often took his carnival to Savannah. Roach also went to Savannah on other occasions, setting up his gambling trailer by gas stations to "roadside"—that is, to swindle people who were playing games of chance for money. During trial, Roach testified that he operated his gambling trailer in Savannah from at least 2000 through 2013. In this timeframe, Roach admitted, he or one of his employees paid Lovett money for protection against arrest.

Various witnesses testified to the fact that Roach's trailer contained two gambling games, and players of both games were regularly hustled out of their money. The person running the game—referred to as the "agent"—would cheat in favor of the player in early rounds, lulling the player into wrongly believing that chances of winning were very high. Then, once the player invested more money, the agent would cheat in favor of Roach, causing the player to lose.

Three to six agents worked out of Roach's carnival trailer, along with a person called the "duker," who drew players into the game. The proceeds of any given day were divided among the duker, the agents, and Roach. But, before the money was divided up, Roach caused a portion to be taken off the top to pay for police protection. In return for these payments, the police—including Lovett when

3

Roach was in his jurisdiction—would allow the swindling to continue and quash complaints of victims.

## B.  The Trial

Various witnesses testified during Lovett's five-day trial, including police officers, agents from the FBI, Roach, and the agents who ran Roach's gambling trailer.  Generally speaking, Roach and his agents testified that, for many years, Roach paid Lovett to avoid arrest.  And the law-enforcement officers' testimony fully supported that.

According to the witnesses' collective testimony, before going to Savannah, Roach would call Lovett to advise him where and when Roach would set up the gambling trailer.  Lovett would then drive out to the trailer to meet Roach and collect Lovett's portion of the proceeds.  Roach's agents testified that they never concealed the gambling activity while in Savannah because they knew that Roach was paying Lovett and had protection.

Although the government presented testimony supporting a finding that Lovett had protected Roach's gambling operation for fourteen years, the trial centered on four specific instances:  the St. Patrick's Day festivals in March 2004 and March 2013, a roadsiding incident in January 2010, and the W.W. Law Foundation Festival in May 2013, during which the FBI used a confidential

4

informant.    The evidence that Lovett protected Roach's swindling gambling operation for years was overwhelming.

### 1. *St. Patrick's Day 2004*

Kevin Ryan, who served as a detective in Savannah in March 2004, testified regarding an experience he had while working undercover during the 2004 St. Patrick's Day festival.  Ryan was working in plain clothes, and he responded to a report of an illegal gambling operation conducted at Roach's trailer in the downtown area.  As Ryan approached the trailer, he saw Lovett, a major at the time, in uniform, about twenty feet away.

Ryan explained that he and another undercover officer went over to the game and attempted to play in order to implicate Roach in illegal gambling.  But according to Ryan, after he placed his money on the table, Lovett "threw himself on the table, pushed the balls back toward the operator, pushed [Ryan's] money back toward [him], and said, 'No, no.  They are closed.  They are closed.'"  Ryan testified that Lovett took these actions even though he knew that the officers were working undercover.

### 2. *January 2010 Roadsiding*

Devin Kennedy, a police sergeant in Savannah, testified about an incident that occurred in January 2010.  At that time, Kennedy responded to a call involving an illegal gambling operation at a gas station.  When Kennedy arrived, he saw

several men with dice, as well as a board with numbers on it.  A man who had played the game admitted that he was gambling and complained that he was cheated out of money.

Based on what he witnessed, Kennedy called fellow officer Detective Roy Coleman to join him at the scene because Coleman had a background in investigating illegal gambling.  Kennedy testified that he saw Lovett, who was then the chief of police, at the gas station, dressed in his uniform.  When Kennedy told Lovett that he was investigating the possibility of an illegal gambling operation, Lovett stated, "I know these guys."

Detective Roy Coleman also testified concerning this incident.  According to Coleman, when Coleman arrived at the gas station, Roach told Coleman that he knew Lovett and had called Lovett on his cell phone.  In the meantime, Coleman concluded, based on what he observed, that Roach's operation was probably an illegal gambling scheme.

While Coleman was speaking with the victim, Lovett drove up in his Crown Victoria, got out of the car, and approached Coleman.  Though Coleman explained to Lovett that the victim had lost money gambling, Lovett mentioned that he knew Roach and vouched that Roach had been around a long time.  Then Coleman saw Lovett speak to the law-enforcement supervisors on the scene and to Roach.  The situation was resolved when one of the men working at the gambling trailer told

the victim that he would return half of the money that he lost.  No arrests were made for illegal gambling.

### 3. *St. Patrick's Day 2013*

FBI Special Agent Joshua Hayes testified that he conducted video surveillance of Roach's gambling operation during the week of the 2013 St. Patrick's Day festivities, from March 13th through March 17th.  William Holtz, one of Roach's agents who was working as an FBI informant, had called, prompting Hayes to go to the carnival and conduct in-person surveillance.  While there, Hayes saw Lovett visit the gambling trailer six times.

During Hayes's testimony, the government played surveillance video of the transactions occurring between Lovett and Roach during the period.  Hayes testified that each time Lovett visited the trailer, he parked his car nearby, and Roach walked up to the car, stuck his arm in the car, and pulled his arm back out, and the two men continued to talk for several minutes.  On one occasion, Hayes saw Lovett exit his car, reach into his pocket, pull out money, and count the money.  Hayes had a handheld camera that captured the transactions.  According to Hayes, most of the time, Lovett was in uniform and was parked approximately 15-20 feet away from the trailer, where people could be seen gambling.

### 4. *2013 W.W. Law Foundation Festival*

Special Agent Hayes also testified that Roach returned to Savannah in May 2013, for the W.W. Law Foundation Festival. During this event, Hayes again recorded Lovett visiting the gambling trailer and meeting with Roach several times.

In an effort to recreate the January 2010 gas-station roadsiding incident, on May 10th, Hayes sent a confidential informant to the festival. The informant started a dispute with one of Roach's agents and called 911. Roach immediately attempted to reach Lovett on his cell phone to provide assistance.

FBI Special Agent Adam Rogalski also testified about his involvement with surveillance during the W.W. Law Foundation Festival, as well as surveillance conducted during the 2013 St. Patrick's Day festivities. Agent Rogalski's testimony supported the other officers' version of these events.

### 5. *Testimony of Roach and His Agents*

Besides these officers, Roach and two of his agents testified during trial. Roach confirmed that he conducted a gambling operation out of the trailer in Savannah and other cities in Georgia and South Carolina. As Roach explained, when he went to Savannah, he was not concerned about being arrested because he paid the police for protection. Specifically, Roach claimed that in 1999 or 2000, he began paying Lovett for protection from arrest. According to Roach, if a player

8

complained to police of being scammed, Roach would simply call Lovett on his cell phone, and Lovett would extinguish the complaint by telling the victim that he or she could be arrested for gambling.

As for particular incidents involving Lovett, Roach confirmed the January 2010 roadsiding incident at the gas station. Roach also substantiated the FBI's surveillance tapes from the 2013 St. Patrick's Day festivities. He stated that he did not hide any of the illegal gambling activities while Lovett was around because he was paying Lovett to avoid arrest.

Two of Roach's agents provided additional support.

First, Emerson Healy stated that he worked for Roach at the gambling trailer for roughly twenty years. Healy confirmed that the games played at the trailer were not legitimate. He also explained how Roach paid police for protection against arrest. Finally, Healy testified that he had witnessed Roach pay Lovett for protection on numerous occasions.

William Holtz, another of Roach's agents, similarly testified that he had worked at Roach's gambling trailer for many years. As we have noted, Holtz eventually became an informant for the FBI. Like Healy, Holtz explained that the games in the trailer were illegal gambling games designed to cheat people out of money. Holtz, who testified that he saw Roach pay Lovett, likewise spoke of how

9

the operation enjoyed police protection and how, in Savannah, Lovett provided very good protection.

As for the January 2010 roadsiding incident, Holtz verified that Lovett showed up after Roach called him to handle the situation. As Holtz recalled, Roach paid Lovett that day for protection, and no one was arrested for illegal gambling.

After Holtz became a confidential informant in March 2012, Holtz testified, he provided Special Agent Hayes with information regarding Roach's illegal gambling operation during Savannah's 2013 St. Patrick's Day festivities. Essentially, Holtz gave Hayes real-time information on the payments that Roach made to Lovett. As Holtz testified about this event at trial, the government played surveillance tapes of gambling activities.

Finally, Holtz testified about the W.W. Law Foundation Festival at which he worked in 2013. Following the incident where 911 was called, Holtz verified with Roach that he had made payments to Lovett for protection. At the time, Holtz was not aware that Roach's phone calls were being recorded by the FBI.

6. *Lovett's Statements*

After the government rested, Lovett took the stand. He flatly denied receiving money from Roach for protection concerning Roach's illegal gambling activities. Instead, Lovett claimed that he and Roach were friends and that Lovett

10

had worked legitimate off-duty jobs providing security for the carnival beginning in the late 1970s and early 1980s. But, Lovett testified, after he became the Chief of Police, he stopped working off-duty jobs and did not receive any money from Roach.

Notably, before trial, Lovett gave statements to FBI Special Agent Rogalski on two occasions. During these interviews, Agent Rogalski testified at trial, Lovett contended that once he became Chief of Police, he stopped working security details and received no money from Roach. Lovett also claimed that he was not aware that Roach was running a gambling operation. Lovett's statements formed the basis of the two counts of making false statements to the FBI.

## 7. *Verdict*

Following the close of evidence, the jury deliberated and found Lovett guilty of one count of aiding and abetting commercial gambling, one count of conspiring to obstruct Georgia's gambling laws, two counts of extortion for the events of March 17, 2013, and two counts of making false statements to FBI agents. Lovett filed a motion for judgment of acquittal and a motion for new trial, but the district court denied the motions. Lovett now appeals.

11

## II.    Lovett's *Batson* Challenge

### A.    *Batson v. Kentucky*

In *Batson v. Kentucky*, the Supreme Court held that the Equal Protection Clause prohibits prosecutors from striking potential jurors "solely on account of their race."  *Batson*, 476 U.S. at 89, 106 S. Ct. at 1719.  In this respect, the Constitution "forbids striking even a single prospective juror for a discriminatory purpose."  *Foster v. Chatman*, __ U.S. __, 136 S. Ct. 1737, 1746 (2016)) (quoting *Snyder v. Louisiana*, 552 U.S. 472, 478, 128 S. Ct. 1203 (2008)).  To assist district courts in addressing *Batson* challenges, the Supreme Court outlined a three-step inquiry that courts must use in order to determine whether peremptory strikes have been used in a discriminatory manner.

First, the party challenging the strike as discriminatory must set forth a *prima facie* case of discrimination.  *Cent. Ala. Fair Hous. Ctr., Inc. v. Lowder Realty Co., Inc.*, 236 F.3d 629, 636 (11th Cir. 2000) (citing *Batson*, 476 U.S. at 96, 106 S. Ct. at 1723).

Second, if the court agrees that a *prima facie* case exists, the striking party must articulate a non-discriminatory (*i.e.*, race-neutral) explanation for its strike.  *Id.*  The reason given need not be a good reason; it can be irrational, silly, implausible, or superstitious, as long as it is facially race-neutral.  *See, e.g., United States v. Hill*, 643 F.3d 807, 837 (11th Cir. 2011).

12

Finally, if the striking party gives a race-neutral rationale, the court must evaluate the persuasiveness of the proffered reason and determine whether the objecting party has carried its burden of proving purposeful discrimination. *Id.*; *see United States v. Allen-Brown*, 243 F.3d 1293, 1297 (11th Cir. 2001). The focus of the third step's inquiry should be on the genuineness of the offered explanation rather than the reasonableness of that explanation. *United States v. Walker*, 490 F.3d 1282, 1294 (11th Cir. 2007) (citing *Purkett v. Elem*, 514 U.S. 765, 769, 115 S. Ct. 1769, 1771-72 (1995) (per curiam)). But the ultimate burden of proving discrimination remains with the party alleging discrimination. *Hill*, 643 F.3d at 837.

## B.    Making a *Prima Facie* Case Under *Batson*

In this appeal, only the first step of *Batson* is at issue. At the first step, the challenging party must show enough facts to support an inference of discrimination before a trial court requires the opposing party to reveal its reasons for a given strike or before this Court can reach the merits of the strikes. *Hill*, 643 F.3d at 837 (citing *United States v. Ochoa-Vasquez*, 428 F.3d 1015, 1038 (11th Cir. 2005)); *Lowder Realty*, 236 F.3d at 636. In other words, the establishment of a *prima facie* case is "an absolute precondition to further inquiry into the motivation behind the challenged strike." *Lowder Realty*, 236 F.3d at 636. Indeed, a trial court errs when

it proceeds with the *Batson* inquiry in the absence of a *prima facie* case. *Id.* at 638-39.

Finding a *prima facie* case of discrimination requires evaluating the totality of the circumstances under which the striking party made the peremptory strikes in question. *See Batson*, 476 U.S. at 93-94, 96, 106 S. Ct. at 1721, 1723; *Hill*, 643 F.3d at 839. *Batson* offered two examples of how a *prima facie* case may be established, one of which is potentially relevant here: "a 'pattern' of strikes against black jurors included in the particular venire might give rise to an inference of discrimination." 476 U.S. at 97, 106 S. Ct. at 1723.

This Court has held that the fact that a party has struck only members of a single race is, by itself, insufficient as a matter of law to establish a *prima facie* case of discrimination. *Lowder Realty*, 236 F.3d at 636-37; *see Hill*, 643 F.3d at 838. Instead, we have in the past looked at the strikes in context, determining for example, whether "members of the relevant racial or ethnic group served unchallenged on the jury," *Ochoa-Vasquez*, 428 F.3d at 1044; whether the striking party struck all members of a race, or as many as it could, from the venire, *id.* at 1045; whether "there is a substantial disparity between the percentage of jurors of a particular race or ethnicity struck and the percentage of their representation on the venire," *id.*; whether there is a substantial disparity between the percentage struck and the percentage represented on the jury, *id.*; and whether the subject matter of

14

the case suggests a racial motive, *Hill*, 643 F.3d at 839.  We have also compared the voir dire answers of the struck jurors with those who were not struck, *Lowder Realty*, 236 F.3d at 637, and compared the race of the defendants with the race of the jurors struck.  *Bui v. Haley*, 321 F.3d 1304, 1318 (11th Cir. 2003).

## C.    Lovett's Challenge

At the beginning of trial, the district court randomly selected thirty-two individuals to form a jury panel, from which the parties ultimately selected twelve jurors and two alternate jurors.  From this thirty-two person venire that included seven African-Americans, the government used five out of its seven peremptory challenges to remove African-American potential jurors.  Two African-Americans ultimately served on the twelve-person jury.

Following jury selection, Lovett, who is African-American, objected, arguing that the government's use of five out of seven peremptory challenges to strike five out of seven African-Americans from the jury was sufficient to establish a *prima facie* case of discrimination under *Batson*.  Lovett's attorney made his *Batson* objection during a sidebar conference.  A transcript of the sidebar conference reveals that counsel for Lovett challenged the government's use of its peremptory challenges on the basis of these numbers alone:  defense counsel objected, "[G]iven the fact the total number of . . . African-American jurors on the panel were seven and they struck five of those out of their total of seven strikes, . .

15

. that would meet [*Batson*] unless they can provide a race-neutral reason for doing so."

In response, the government attacked Lovett's objection for failure to make a *prima facie* case under *Batson*.  The government emphasized the presence of two African-American individuals on the jury and the fact that it did not use all of its peremptory challenges to strike all seven African-Americans on the venire.  Then the government attempted to turn Lovett's argument around against Lovett, arguing that under Lovett's rationale, Lovett violated *Batson* since he used *all* of his peremptory challenges to strike only white members of the venire.

The district court overruled Lovett's *Batson* challenge, pointing out that Lovett must show improper motive on the part of the government; without more, the court concluded, Lovett could not meet his burden by merely pointing to the fact that the government struck five out of seven African-Americans from the venire.  Acknowledging the government's counter-argument, the district court also commented on Lovett's use of all of his strikes to excuse white individuals from serving on the jury.[1]  But in its post-trial denial of Lovett's motion for a new trial, the district court upheld its overruling of Lovett's *Batson* challenge based

---

[1] The district court explicitly noted, "[D]efendant used every one of his strikes to strike . . . whites off the jury."  The court continued, "If you've got a race-neutral reason to strike all of your strikes to take white people off the jury, then you don't concede that they could have a race-neutral reason to use five of their strikes?"

16

exclusively on Lovett's reliance on numbers alone to meet his burden to establish a *prima facie* case of discrimination under *Batson*.

On appeal, Lovett contends that the district court clearly erred in finding that a *prima facie* case under *Batson* had not been established.  So, Lovett argues, the burden should have shifted to the government to produce race-neutral reasons for striking each of the five African-American potential jurors.  Lovett also claims that, in denying his *Batson* challenge, the district court applied the wrong legal standard.  We find no reversible error.

**D.    Standard of Review and Discussion**

We review for clear error a district court's denial of a *Batson* challenge at step one of the inquiry.  *United States v. Robertson*, 736 F.3d 1317, 1324 (11th Cir. 2013); *Hill*, 643 F.3d at 837-38.  In so doing, we give "great deference" to the district court's finding with respect to whether a *prima facie* case of impermissible discrimination has been established.  *United States v. Houston*, 456 F.3d 1328, 1334 (11th Cir. 2006); *Ochoa-Vasquez*, 428 F.3d at 1039; *Allen-Brown*, 243 F.3d at 1296-97.  A district court's ultimate conclusion that a strike was or was not discriminatory is a determination of fact that we will not disturb on appeal unless it is clearly erroneous.  *Allen-Brown*, 243 F.3d at 1297.  A factual finding is clearly erroneous only if it is not supported by substantial evidence and we are "left with a

definite and firm conviction that a mistake has been committed." *United States v. Rodriguez-Lopez*, 363 F.3d 1134, 1137 (11th Cir. 2004) (citation omitted).

At the outset, we note that during the *Batson* side-bar, the trial judge, at one point, appeared to suggest that Lovett bore the burden of showing that the government had no race-neutral reason for how it used its peremptory strikes before the government had to come forward with race-neutral reasons for its strikes. This suggestion is plainly incorrect under our caselaw. And had the district court based its ruling on this incorrect standard, we might be inclined to remand.

But ultimately, the district court did not rest its overruling of Lovett's objection on this basis. Instead, the district court set forth the correct legal standard when it issued its subsequent written order denying Lovett's motion for new trial because it found that Lovett had failed to make out a *prima facie* case since his challenge was based on numbers alone. We therefore do not remand the matter to the district court on this ground.

We are similarly troubled by the district court's comments regarding Lovett's use of all his peremptory challenges to strike white members of the venire. Whether the challenging party may have engaged in its own *Batson* violation has no bearing on and is an improper consideration in evaluating whether

18

the challenged party violated *Batson*.  Nevertheless, the district court's comments in this regard do not support remand on this record.

A review of the trial transcript and the later written order denying Lovett's motion for new trial makes clear that the district court did not base its denial of the *Batson* challenge on the fact that the defense used all of its strikes to remove white individuals from the venire.  Rather, the record demonstrates that the district court denied Lovett's challenge because he based it solely on numbers—that the government used five of seven strikes to remove African-American individuals from the jury pool—and that he declined to offer any other arguments in support of his *Batson* challenge, despite the fact that the district court offered him the opportunity to do so.  On this ground alone, the district court determined that Lovett failed to show discriminatory intent on the part of the government.

Applying "great deference," as we must, we find the district court did not clearly err when it concluded that Lovett failed to present evidence sufficient to raise an inference of purposeful discrimination.  *See United States v. Allison*, 908 F.2d 1531, 1537 (11th Cir. 1990).  As we have made clear, Lovett made his *Batson* challenge solely on the ground that the government used five out of seven of its peremptory challenges to strike five of the seven African-Americans from the jury pool.  While this fact is troubling, the district court emphasized that the government exercised two of its strikes against white potential jurors, which

19

resulted in two African-Americans serving on the final jury. And we have held that striking a juror or a number of jurors of a particular race does not in and of itself necessarily create an inference of racial discrimination. *Lowder Realty*, 236 F.3d at 636.

Our precedent requires something beyond the number of jurors struck to establish a *prima facie* case. *See Hill*, 643 F.3d at 838-840 (noting that statistics of jurors struck alone do not establish a *prima facie* case); *Lowder Realty*, 236 F.3d at 636-37, ("the number of persons struck takes on meaning *only* when coupled with other information such as the racial composition of the venire, the race of others struck, or the voir dire answers of those who were struck compared to the answers of those who were not struck."); *compare Robertson*, 736 F.3d at 1326-27 (finding a *prima facie* case from the striking of a single African-American juror in the context of the case, which involved a white supremacist on trial for killing a African-American man and the venire contained only three African-American members); *Walker*, 490 F.3d at 1291-92 (finding a *prima facie* case when the defense used all of its strikes against white people and removed over half of the white jurors on the venire).

In this case, though the district court specifically provided Lovett with an opportunity to present facts tending to support an inference of discrimination, Lovett continued to rely on only the number of jurors struck and did not raise any

other circumstances supporting discriminatory intent. Nor can we discern from the record such intent. First, none of the prosecutor's comments during voir dire suggest a discriminatory purpose. Second, nothing in the record identifies the race of any of the individuals composing the venire. So we cannot discern, for example, whether the prosecution struck an African-American juror who was similarly situated to a white juror whom the government did not strike. Put simply, Lovett did not develop a record that allows us to draw an inference of discrimination. And third, the underlying case—one involving extortion and gambling crimes—is not overtly racial in nature such that it would suggest a motive for discriminatory use of peremptory strikes. *See Hill*, 643 F.3d at 839.

We recognize the fact that the government used a significant number of its peremptory challenges to strike a portion of the African-American panel members, resulting in a disparity between the percentage of African-American jurors on the venire (22%) and the percentage of their representation on the jury (14%). But under our caselaw, that fact alone is not enough. We cannot say, based on the totality of the circumstances, that the district court clearly erred in denying the *Batson* challenge. *See e.g., United States v. Campa*, 529 F.3d 980, 989 (11th Cir. 2008) (no *prima facie* case of discrimination where the government used 78% of its strikes (7 of 9) to remove African-American jurors, resulting in a jury that was 25% African-American); *see also Ochoa-Vasquez*, 428 F.3d at 1045-46 (no *prima*

*facie* case where 44 of 82 (54%) of the venire members were Hispanic, the government used 5 of its 9 (56%) strikes against Hispanics, and 6 of the 17 (35%) jurors and alternates selected to serve were Hispanic).

### III.    Sufficiency of the Evidence

This Court reviews *de novo* the sufficiency of the evidence to support a criminal conviction.  In doing so, the Court views all of the evidence "in the light most favorable to the government and draw[s] all reasonable inferences and credibility choices in favor of the jury's verdict."  *United States v. Grzybowicz*, 747 F.3d 1296, 1304 (11th Cir. 2014); *United States v. Hansen*, 262 F.3d 1217, 1236 (11th Cir. 2001) (per curiam).  In conducting this review, "[i]t is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt."  *United States v. Young*, 906 F.2d 615, 618 (11th Cir. 1990).  This is so because "[a] jury is free to choose among reasonable constructions of the evidence."  *United States v. Vera*, 701 F.2d 1349, 1357 (11th Cir. 1983) (citations and internal quotations omitted).  We accept reasonable inferences that tend to prove the government's case whether the evidence presented is direct or circumstantial.  *United States v. Williams*, 390 F.3d 1319, 1324 (11th Cir. 2004).

## A.  Aiding and Abetting Commercial Gambling and Conspiracy to Obstruct State Commercial Gambling Laws

Lovett argues that the government presented insufficient evidence to support his aiding-and-abetting and conspiracy convictions.[2]  In support of his argument, Lovett focuses on two incidents relied upon by the government:  (1) the 2010 roadsiding incident at the gas station and (2) the 2013 incident at the W.W. Law

---

[2] Count 1 of the superseding indictment charged Lovett with aiding and abetting commercial gambling in violation of 18 U.S.C. § 1955.  This section makes it a crime to conduct an "illegal gambling business," which is statutorily defined as a business that (1) violates the law of the state where the business operates; (2) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of the business; and (3) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.  *See* 18 U.S.C. § 1955(b).  A person conducts an illegal gambling business by "performing any necessary function in the gambling operation, other than that of mere bettor."  *United States v. Miller*, 22 F.3d 1075, 1077 (11th Cir. 1994).

Count 2 of the superseding indictment charged Lovett with conspiring with Roach and one of Roach's agents, Kenny Blount, to obstruct the enforcement of the laws of Georgia, with the intent to facilitate an illegal gambling business in violation of 18 U.S.C. § 1511.  The term "illegal gambling business" has the same definition as that set forth in § 1955(b).  Section 1511(a) provides as follows:

> It shall be unlawful for two or more persons to conspire to obstruct the enforcement of the criminal laws of a State or political subdivision thereof, with the intent to facilitate an illegal gambling business if—
>
> (1) one or more of such persons does any act to effect the object of such a conspiracy;
>
> (2) one or more of such persons is an official or employee, elected, appointed, or otherwise, of such State or political subdivision; and
>
> (3) one or more of such persons conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business.

18 U.S.C. § 1511(a).

Foundation Festival. Primarily, Lovett argues that on each of these dates, by the time Lovett or one of the SCMPD officers he dispatched to the scene arrived, the responding officers had already determined that insufficient proof existed to pursue gambling charges.

We disagree. But even if insufficient evidence supported the conspiracy and aiding-and-abetting convictions as they relate to the 2010 roadsiding incident and the 2013 W.W. Law Foundation Festival incident—to be clear, we think the record amply supports both convictions as they concern these two incidents[3]—the government presented overwhelming other evidence at trial that independently supports the convictions.

Most obviously, Roach and two of his agents testified to the conspiracy between Lovett and Roach and the protection that Lovett gave Roach for his illegal

_____

[3] Though Lovett claims that Detective Coleman determined that insufficient evidence of gambling existed during the 2010 roadsiding incident, Coleman himself denied that assertion. Instead, Coleman explained that while he was investigating, Lovett drove to the scene and essentially vouched for Roach. According to Coleman, Lovett's presence "definitely" affected how he approached the investigation. And though an FBI report stated that Coleman indicated that there was insufficient evidence to make an arrest, Coleman denied making the statement. Instead, Coleman testified that, in his opinion, enough evidence supported an arrest, but, typically, he worked this type of gambling case in an undercover capacity to develop stronger evidence. Sergeant Kennedy likewise made clear that any further investigation of the roadsiding incident did not occur because of Lovett's presence at the scene. As for the W.W. Law Foundation Festival incident, Officer David Lane testified that he said the gambling matter that day would be handled civilly only because he was told that Lovett had sent a supervisor out to the scene, and he felt that the decision regarding how to handle the situation had been taken "out of his hands" at that point. Lane explained, "I felt like it was above my pay grade, that there must be somebody that was approving [the civil handling of the situation] over me." It was within the jury's province to choose to believe the testimony of Coleman, Kennedy, and Lane. These witnesses' testimony supports the jury's verdict as it relates to the conspiracy and aiding-and-abetting convictions concerning the roadsiding and W.W. Law Foundation Festival incidents.

24

gambling operation in exchange for payment.  In and of itself, this evidence was sufficient to support the convictions.

But that is not all.  Officers who worked with Lovett also testified in support of the conspiracy, noting that Lovett showed up when they were investigating Roach, advised them that he knew Roach, and broke up what he knew was an undercover investigation of Roach.  And an FBI agent testified to seeing Roach give money to Lovett.  In addition, the government presented surveillance videos showing Lovett meeting Roach at his gambling operation six times during the 2013 St. Patrick's Day festival and several times during the 2013 W.W. Law Foundation Festival.

True, Lovett took the stand and denied having received any money from Roach or having known about the illegal gambling operation.  But the jury clearly disbelieved him.  When a defendant chooses to testify, as Lovett did, any statement that the jury disbelieves "may be considered as substantive evidence of the defendant's guilt."  *Williams*, 390 F.3d at 1325 (quoting *United States v. Brown*, 53 F.3d 312, 314 (11th Cir. 1995)).  Here, the jury accepted the testimony of other officers, FBI agents, Roach, and Roach's agents.  The jury was present for all testimony and made credibility determinations in favor of the government and against Lovett.  We do not second-guess these credibility determinations.  *See*

25

*Crystal Entm't & Filmworks, Inc. v. Jurado*, 643 F.3d 1313, 1320 (11th Cir. 2011);

*United States v. Chastain*, 198 F.3d 1338, 1351 (11th Cir. 1999).

Considering the evidence in the light most favorable to the government and drawing all reasonable inferences in favor of the jury's verdict, far more than sufficient evidence existed from which a jury could conclude that Lovett was guilty of aiding and abetting Roach's gambling operation and that he obstructed the enforcement of Georgia's gambling laws.

## B.    Extortion

Next, Lovett contends that the government failed to prove that the cash payments he received had some effect on interstate commerce.  In support of his argument, Lovett relies on the fact that each of the five counts in the superseding indictment alleged local transactions in a single municipality in the state of Georgia—Savannah.  So, Lovett asserts, his actions could not have had an effect on interstate commerce.  We are not persuaded.

The Hobbs Act contains a jurisdictional requirement that requires an effect on "commerce,"[4] which the Act defines as follows:

---

[4] The Hobbs Act provides,

> Whoever in any way or degree obstructs, delays, or *affects commerce* or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in

26

> commerce within the District of Columbia, or any Territory or Possession of the United States; all commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof; all commerce between points within the same State through any place outside such State; and all other commerce over which the United States has jurisdiction.

*See* Section 1951(b)(3).  We have concluded that this requirement "can be met simply by showing that the offense had a 'minimal' effect on commerce." *United States v. Verbitskaya*, 406 F.3d 1324, 1331 (11th Cir. 2005) (citing *United States v. Jackson,* 748 F.2d 1535, 1537 (11th Cir. 1984) and *United States v. Summers,* 598 F.2d 450, 454 (5th Cir. 1979)).

The record here easily satisfies that requirement.  We have determined that commerce is affected when "an enterprise, which either is actively engaged in interstate commerce or customarily purchases items in interstate commerce, has its assets depleted through extortion, thereby curtailing the victim's potential as a purchaser of such goods." *United States v. Ransfer*, 749 F.3d 914, 936 (11th Cir. 2014) (quoting *Jackson*, 748 F.2d at 1537).

Here, Roach's carnival was actively engaged in interstate commerce.  As we have noted, Roach's carnival was a traveling carnival.  The government presented

---

violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.

18 U.S.C. § 1951(a) (emphasis added).

evidence that Roach's carnival conducted business throughout south Georgia and South Carolina.  By expending money for Lovett's extortion, Roach's carnival had less to spend on other goods, including, among other things, gas to allow him to travel with his carnival through south Georgia and South Carolina.  These facts establish the necessary interstate-commerce requirement.

Indeed, we have previously found the "interstate commerce" requirement met under § 1951(b)(3) even where the effect on commerce was minimal and the extorted payment took place in only one state.  *See, e.g., Jackson*, 748 F.2d at 1537 (construction business that bought materials that had traveled in interstate commerce, was extorted $5,000, which depleted its assets and burdened it with an additional cost of doing business).  As we have noted, Roach's carnival operated in two states.

Additionally, Roach testified that he always called Lovett before he arrived in Savannah to operate his carnival and gambling trailer.  Cell-phone records confirm this testimony.  On this record, a reasonable jury could have inferred that Roach placed at least some of these phone calls when he was traveling outside Georgia.  The placement of out-of-town phone calls in furtherance of the extortionate activity creates a further connection to interstate commerce.  *See e.g., United States v. Kaplan*, 171 F.3d 1351, 1355 (11th Cir. 1999).

Because the government satisfied the interstate-commerce element, we deny Lovett's challenge on this ground.

## C.    Making False Statements

The government presented evidence that, during an FBI interview conducted on May 1, 2014, Lovett made two false statements. During the interview, Lovett stated that he neither knew of Roach's illegal gambling operation nor received any money from Roach since becoming the chief of SCMPD in 2010. These statements formed the basis of charges against Lovett upon which he was ultimately convicted. On appeal, Lovett contends that the government failed to establish venue—a threshold constitutional element in every criminal prosecution—because it did not show that Lovett made the alleged false statements within the Southern District of Georgia, where he was tried and convicted.

The Sixth Amendment to the Constitution provides a defendant with the right to a trial in the district in which the crime was committed. *United States v. DiJames*, 731 F.2d 758, 761 (11th Cir. 1984). Rule 18 of the Federal Rules of Civil Procedure preserves this right by providing that "[e]xcept as otherwise permitted by statute or by these rules, the prosecution shall be had in a district in which the offense was committed." Fed. R. Crim. P. 18. When reviewing an improper-venue claim, this court must determine "whether, viewing the evidence in the light most favorable to the government and making all reasonable inferences

29

and credibility choices in favor of the jury verdict . . . the Government proved by a preponderance of the evidence that the offense took place within the trial district." *United States v. Burroughs*, 830 F.2d 1574, 1580 (11th Cir. 1987) (citations and internal quotations marks omitted); *United States v. De La Cruz Suarez*, 601 F.3d 1202, 1217 (11th Cir. 2010) (government must prove by a preponderance of the evidence that the crime occurred within the district of the trial).

Applying this standard, we easily conclude that the government produced enough evidence to establish that Lovett's false statements to the FBI were made in the Southern District of Georgia, where he was tried and convicted. Each FBI agent who testified stated that the interviews of Lovett were conducted at his residence. And Special Agent Rogalski specified that the May 1, 2014, interview took place at "Mr. Lovett's residence, which is on Talahi Island in Savannah." FBI Agent Hayes also identified Lovett's residence as being on Talahi Island.

Because it is clear that all of the FBI interviews of Lovett took place in the Southern District of Georgia, venue was proper. *See De La Cruz Suarez*, 601 F.3d at 1217 ("[W]hen circumstantial evidence as a whole reasonably supports the inference that the crime was committed in the trial district, the government's burden is satisfied."); *United States v. Greer*, 440 F.3d 1267, 1271 (11th Cir. 2006) (government's burden to establish venue may be met through direct or circumstantial evidence and judicial notice may be used; search was conducted at

residence located in Cussetta, Georgia and court took judicial notice that city was located in the Middle District of Georgia.)

## IV.    Sentencing Enhancement

Finally, Lovett contends that the district court erred in imposing a six-point specific offense characteristic pursuant to U.S.S.G § 2C1.1(b)(2) when it concluded that Lovett received at least $30,000 in payments from the gambling operation.  When considering Sentencing Guidelines issues, we review "purely legal questions *de novo*, a district court's factual findings for clear error, and, in most cases, a district court's application of the guidelines to the facts with due deference."  *United States v. Rothenberg*, 610 F.3d 621, 624 (11th Cir. 2010) (internal quotation marks and citations omitted).  Due deference is tantamount to clear-error review.  *Id.* (citing *United States v. White*, 335 F.3d 1314, 1317 (11th Cir. 2003).  "For a finding to be clearly erroneous, this Court must be left with a definite and firm conviction that a mistake has been committed."  *Rothenberg*, 610 F.3d at 624 (internal quotation marks and citation omitted).

Lovett suggests the district court improperly determined the amount of loss in this case.  We review a district court's determination of loss for clear error because it constitutes a factual finding.  *United States v. Barrington*, 648 F.3d 1178, 1197 (11th Cir. 2011).  "The Guidelines do not require a precise determination of loss," so "[a] sentencing court need only make a reasonable

31

estimate of the loss, given the available information." *Id.* (internal quotation marks and citations omitted). Still, "a sentencing judge may not speculate about the existence of a fact that would result in a higher sentence, and the government must support its loss calculation with reliable and specific evidence." *Id.* (quotation marks and citation omitted).

Here, the district court relied on U.S.S.G. § 2C1.1(b)(2) to apply the six-level sentencing enhancement. Generally speaking, Section 2C1.1 deals with the sentencing of defendants, including public officials, who extort money from others. As pertinent here, the November 2014 version of Section 2C1.1(b)(2) used by the district court when sentencing Lovett states,

> If the value of the payment, the benefit received or to be received in return for the payment, the value of anything obtained or to be obtained by a public official or others acting with a public official, or the loss to the government from the offense, whichever is greatest, exceeded $5,000, increase by the number of levels from the table in § 2B1.1 (Theft, Property Destruction, and Fraud) corresponding to that amount.

U.S.S.G. 2C1.1 (November 2014). Section 2B1.1(b)(1), in turn, provides that if the loss is more than $30,000, but less than $70,000, the court should increase the level by 6. The commentary to Section 2B1.1 indicates that "[t]he court need only make a reasonable estimate of the loss. The sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence. For

32

this reason, the court's loss determination is entitled to appropriate deference." 2B1.1 cmt. n.3(C) (citing 18 U.S.C. § 3742(e) and (f)).

Here, the district court concluded that the government produced evidence that Lovett received at least $30,000 in payments from Roach, but less than $70,000. The district court reached its determination based on the trial testimony and PSR, which established that the gambling operation took place from 2000 through 2013.[5]

Relying on the testimony of Roach, Holtz, and Healy, the district court recognized that Roach paid Lovett out of monies he swindled during roadsiding incidents; New Year's Eve, St. Patrick's Day, and Martin Luther King, Jr., celebrations; and the W.W. Law Foundation Festival. Roach, Holtz, and Healy also testified about the frequency with which Roach brought the gambling trailer into town. They likewise stated the amount of money that Roach paid Lovett during each of the events.

In relying on this evidence, the district court did not clearly err when it concluded that Lovett received between $30,000 and $70,000 over the applicable fourteen-year period. The PSR conservatively attributed to Lovett the extortion of $32,900 from Roach. The testimony of Roach, Holtz, and Healy supported the

---

[5] A district court's factual findings may be based upon evidence presented at trial or undisputed statements in the pre-sentencing report. *United States v. Wilson*, 884 F.2d 1355, 1356 (11th Cir. 1989).

33

conclusion that Lovett was paid approximately $22,400 in relation to the St. Patrick's Day festivities over a fourteen-year period ($100 per agent per day, multiplied by four agents = $400 per day; $400 per day multiplied by 4 days = $1,600; $1,600 over 14 years = $22,400). It further supported the PSR's calculation of $10,500 in payments for gambling activities on New Year's Eve and Martin Luther King, Jr., Day ($100 per agent per day, multiplied by two to three agents per day = $250 per day; $250 per day multiplied by three days = $750; $750 over 14 years = $10,500). So, counting only the St. Patrick's Day, New Year's, and Martin Luther King, Jr., events, the district court reasonably could have concluded that Lovett received $32,900 from Roach during the relevant period.[6] Of course, this figure does not include the W.W. Law Foundation Festival or days when Roach's gambling trailer was roadsiding.

Lovett complains that Roach, Holtz, and Healy all had criminal records and two received a benefit from cooperating with the FBI. But determining the credibility of witnesses falls within the province of the factfinder, and we will not ordinarily review a factfinder's determination of credibility. *Jurado*, 643 F.3d at 1320. The district court was in the best position to determine credibility and

---

[6] Though the PSR conservatively calculated that Lovett had extorted $32,900 from Roach, it nonetheless noted that this estimate did not include additional days that Roach paid Lovett for protection during the W.W. Law Foundation Festival. Taking these events into consideration, the PSR concluded that Lovett likely extorted over $70,000 from Roach. *Id.*

apparently found these witnesses' testimony regarding payments to Lovett to be credible.  We find no clear error in the district court's determination.

## V.     Conclusion

We affirm Lovett's convictions, finding that the evidence presented at trial was sufficient for the jury to find him guilty of the counts charged.  We also affirm the denial of Lovett's *Batson* challenge because we conclude that the district court did not clearly err in its determination.  Finally, we affirm the district court's application of a six-level enhancement when it sentenced Lovett to a term of ninety months in prison.

**AFFIRMED.**