[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 24-10137

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

JAVONNE WILKS,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 0:23-cr-60123-RS-1

_____

Before ROSENBAUM, LUCK, and ABUDU, Circuit Judges.

PER CURIAM:

Javonne Wilks appeals his convictions and 324-month total sentence for armed bank robbery, 18 U.S.C. §§ 2113(a), (d) & 2, brandishing a firearm in furtherance of a crime of violence, 18 U.S.C. § 924(c)(1)(A)(ii), and armed credit union robbery, 18 U.S.C. §§ 2113(a), (d) & 2. On appeal, Wilks argues the district court abused its discretion in denying his request to withdraw his plea and that his sentence, a variance above the applicable Sentencing Guidelines range, is substantively unreasonable. After careful review, we affirm.

## I. FACTUAL BACKGROUND & PROCEDURAL HISTORY

In June 2023, Wilks was charged in a criminal complaint with bank robbery, 18 U.S.C. §§ 2113(a) & 2, and brandishing a firearm during a crime of violence, 18 U.S.C. §§ 924(c)(1)(A)(ii) & 2, via criminal complaint. The complaint alleged that Wilks committed an armed robbery of the Centennial Bank on April 26, 2022, in Cooper City, Florida. It also detailed several other robberies which were potentially related. At a pretrial detention hearing, Wilks's counsel asked the government's case manager whether the banks had "serial numbers or anything identif[ying]" the bills which were taken during the robbery. The case manager testified that the government did not have such information and explained "that the individuals involved with the[se] robberies . . . knew not to take the bait bills or any bills that would be registered by the banks."

Subsequently, a grand jury indicted Wilks with one count of armed bank robbery, 18 U.S.C. §§ 2113(a), (d) & 2 ("Count One"), one count of armed credit union robbery, 18 U.S.C. §§ 2113(a), (d) & 2 ("Count Three"), and two counts of brandishing a firearm in furtherance of a crime of violence, 18 U.S.C. §§ 924(c)(1)(A) & 2 ("Counts Two and Four"). On September 20, 2023, Wilks agreed to plead guilty to Counts One, Two, and Three in a written plea agreement. In exchange, the government agreed to dismiss Count Four. The plea agreement clarified that Wilks's sentence would be imposed by the district court and that he would not be permitted to withdraw his plea because of the sentence imposed. The agreement provided the statutory maximum and minimum terms for each of Wilks's counts of conviction—noting that Counts One and Three had a maximum term of imprisonment of 25 years and Count Two had a mandatory minimum term of 7 years and a maximum term of life imprisonment.

Wilks and the government also agreed to a "factual proffer" in which they "agree[d] that had this case gone to trial, the United States would have proven the following facts:"

On April 2, 2022, the owner of a Nissan Maxima parked the car in Hialeah, Florida. The next day, both the Nissan Maxima and Wilks's car, a Nissan Altima, drove away, and Wilks's cell phone utilized a cell tower near the cars. Two days later, the owner of the Maxima returned and, finding their car gone, reported its theft to law enforcement.

On April 6, Wilks called co-conspirators on his cell phone from Miami, Florida, and then traveled to Opa Locka, Florida. Cellphone data showed that Wilks traveled toward Centennial Bank. At approximately 11:20 AM, Wilks and two co-conspirators entered Centennial Bank wearing dark colored skull hats, dark face masks, and coveralls. Each was armed with a firearm—either an AR-15 style long gun or a handgun. Upon entering the bank lobby, the men forced two bank employees to the ground at gun point. One of the men approached two bank tellers, jumped over the counter, and demanded entry into the cash drawers and the vault. The tellers complied, and the three men stole approximately $242,113 in currency. They left the bank and fled in the Nissan Maxima.

After the robbery, law enforcement located the Nissan Maxima abandoned at a 7-Eleven convenience store in Cooper City, Florida, approximately five minutes from the Centennial Bank. The license plate on the Nissan Maxima was stolen. Footage from nearby surveillance cameras showed the three men exiting the Nissan Maxima, entering an SUV, and fleeing. Law enforcement matched DNA off the front passenger door of the Nissan Maxima to Wilks. Between April and October 2022, Wilks deposited over $30,000 in cash into his bank account and bought a car.

On June 5 and 6, 2023, license plate readers detected Wilks's vehicle in the immediate vicinity of the Self Help Credit Union. On June 6, Wilks and an unidentified coconspirator entered Self Help wearing long pants, masks, and bicycle helmets. The two men

were armed, one with a semiautomatic handgun and one with a revolver. They ordered all of the employees to the lobby while brandishing their firearms. They then ordered the head teller and the manager to open the vault at gunpoint. The head teller put money from the vault into a bag brought by the men. The bank suffered a loss of around $29,000. Wilks and the other man fled on bicycle.

Later that day, officers stopped Wilks in his vehicle and took him into custody. Wilks's girlfriend, who was in his vehicle, had $1,000 in crisp bills on her person. In Wilks's car, officers recovered three jumpsuits like those worn during the Centennial Bank robbery, a sweatshirt similar to the one worn during the Self Help robbery, $11,395 in cash, and a receipt for a helmet and sweatshirt similar to those worn during the Self Help robbery. The $11,395 contained some bait money from Self Help.

At the change of plea hearing, Wilks was placed under oath and confirmed he understood that any of his answers, if false, could be used against him in another prosecution for perjury or for making a false statement. Wilks confirmed that he had completed twelfth grade in school, had not been treated for any mental illness, was not under the influence of any substance that prevented him from understanding the proceedings, and his counsel expressed his confidence that Wilks was competent to plead guilty.

Wilks then confirmed that he and his attorney discussed the charges against him, the indictment, and "possible defense strategies," and he stated that he was "fully satisfied with

the . . . representation and advice" his attorney gave him. The government then summarized the nature of each of the charges to which Wilks was pleading guilty, and Wilks's counsel confirmed he had "familiarize[d]" Wilks with these charges. Counsel stated that he provided Wilks a copy of the indictment and the discovery received from the government, visited with him on multiple occasions, answered his questions, and discussed "the discovery materials, trial strategy, the maximum and minimum mandatory penalties involved in this case, the plea agreement, the factual proffer and anything else."

The district court next discussed the plea agreement with Wilks. Wilks confirmed that he had read the plea agreement and had done so in the presence of his attorney and stated that he "understood everything contained on every page." He also agreed that there were no additional promises between him and the government and that he had no questions about the agreement. The court also warned Wilks that any recommendations in the plea agreement were not binding and that it could impose a sentence more severe than Wilks might anticipate. The government summarized the mandatory minimum and statutory maximum penalties for each count and Wilks agreed that the government's summary was accurate.

Wilks then confirmed that no one had "made any promise to [him] of any kind to induce [him] to plead guilty in this case," that no one had "forced [him] to plead guilty in this case," and that his lawyer had "done everything that [he had] asked him to do

regarding" this case.  He also confirmed that he was "pleading guilty of [his] own free will because" he was, "in fact, guilty."  The court summarized the various trial rights he was forfeiting by pleading guilty and Wilks stated that he understood these rights and that he was forfeiting them by pleading guilty.

Next, the government presented a factual basis for the guilty plea, consistent with the proffer.  The court asked Wilks if he understood these facts and "agree[d] that" they were "a true and correct statement of what ha[d] transpired."  Wilks agreed, with one small correction not relevant to this appeal.  Wilks's counsel stated he was satisfied that there was a sufficient factual basis for the plea.

In light of the foregoing, the court found that Wilks was "fully competent and capable of entering an informed plea and that" he was "aware of the nature of the charges and the consequences of the plea based upon his conversations with his attorney and the colloquy before the court."  Accordingly, it concluded that Wilks's guilty plea was "a knowing, intelligent and voluntary plea supported by an independent basis in fact containing each of the essential elements of the offense."  The court also found "that the plea agreement presented . . . was voluntarily entered into, and that neither the plea nor the plea agreement were the result of either force, threats or coercion."  It also concluded that Wilks "entered the plea agreement with the advice and assistance of effective and competent counsel."  Therefore, it accepted the plea and adjudged Wilks guilty.

Six days after pleading guilty, Wilks moved to withdraw his plea. Wilks's counsel represented that Wilks believed he was "misled" by counsel "into accepting the plea agreement" which, in addition, appeared to create a conflict. Wilks therefore requested to withdraw his plea and calendar the case for trial. Wilks also submitted a *pro se* motion requesting that his counsel withdraw. The government opposed the motion, contending that no facts weighed in favor of withdrawal. It argued that Wilks had received close assistance of counsel by the Assistant Federal Public Defender, that the plea agreement provided a benefit to Wilks by dismissing Count Four, and that Wilks had confirmed at the plea hearing he had no conflict with his attorney. Further, it argued that the district court ensured that he entered into the plea agreement knowingly and voluntarily, that denying the motion would not serve to conserve judicial resources, and that granting the motion would disrupt the finality of the convictions and the closure the agreement provided to victims.

The district court denied Wilks's motion to withdraw his plea in a paperless order. Wilks's counsel then moved to withdraw due to conflict, citing Wilks's *pro se* filing. Before that motion was ruled on, Wilks filed two more *pro se* motions seeking to withdraw his plea. In these filings, Wilks explained that he had not reviewed the discovery regarding the Self Help robbery and did not have "adequate time" to do so before pleading guilty. He also asserted that his attorney had failed to discuss "pertinent information" with him. One such piece of information related to the use of "bait money." Specifically, Wilks contended that there was no ledger from the

24-10137                Opinion of the Court                9

bank confirming that the money recovered was bait money. These errors, Wilks contended, made him erroneously believe that the government would be able to prove his guilt and that he "had no other choice but to plead guilty and [e]nter into [the] plea agreement." For these reasons, Wilks requested a hearing. The district court denied Wilks's *pro se* filings but granted counsel's request to withdraw and appointed substitute counsel. Wilks filed another *pro se* motion, which alleged that counsel had withheld discovery, rendering his plea not knowing and voluntary. However, the court denied that motion as well, noting that Wilks had counsel and thus could not submit *pro se* filings under the local rules. *See* S.D. Fla. L.R. 11.1(d)(4).

A probation officer prepared a presentence investigation report ("PSI") in advance of Wilks's sentencing. The PSI summarized the offense conduct in a manner consistent with the factual proffer. The PSI then used that offense conduct to calculate an advisory guidelines range. First, for Count One, the PSI calculated Wilks's base offense level to be 20, U.S.S.G. § 2B3.1(a), and then added 4 levels, under U.S.S.G. § 2B3.1(b)(1) & (b)(7)(C), because, during the offense, the property of a financial institution was taken, and the loss caused was $242,113. For Count Three, the PSI calculated a base offense of 20, U.S.S.G. § 2B3.1(a), and then added two levels, U.S.S.G. § 2B3.1(b)(1), because the property of a financial institution was taken. The PSI then added six levels, under U.S.S.G. § 2B3.1(b)(2)(B), because the offense involved the use of a firearm. Further, because the loss amount was $29,000, the PSI added one level under U.S.S.G. § 2B3.1(b)(7)(B). Applying the multiple count

adjustments in U.S.S.G. § 3D1.4, the PSI calculated a combined adjusted offense level and total offense level of 30.

The PSI calculated Wilks's criminal history category at II based on three criminal history points for 2005 convictions for possession with intent to distribute cocaine and possession of a firearm by a convicted felon. *See generally United States v. Wilks*, 464 F.3d 1240 (11th Cir. 2006). Wilks was 22 years old when he committed those offenses, and he received a 212-month sentence, followed by a 5-year term of supervised release. Wilks committed the offenses in this case while still on supervised release. The PSI also noted several convictions which did not lead to criminal history points, including: (1) 1997 convictions for aggravated assault on a law enforcement officer, grand theft auto, burglary with assault or battery, and strongarm battery, which Wilks committed when he was 14 years old; (2) grand theft auto, which Wilks committed when he was 16; (3) gambling, which Wilks committed at 18; and (4) attempted armed robbery, which Wilks committed at 19.

Based on Wilks's total offense level of 30 and a criminal history category of II, the probation officer calculated a guidelines range of 108 to 135 months' imprisonment for Counts One and Three. The PSI noted, however, that Wilks faced a mandatory minimum consecutive 84-month term of imprisonment for Count Two. *See* 18 U.S.C. § 924(c)(1)(A)(i), (D)(ii).

Wilks objected to the PSI on the grounds that the facts in the PSI were "developed or established through . . . problematic cell phone data" which the government would not be able to prove at

sentencing. He also reiterated that, though he believed he had been provided all discovery before his guilty plea, he did not receive the last of the government's discovery until after he pled guilty. This information, he asserted, included FBI reports suggesting that certain cell phone data was inconclusive and not beneficial to the government's case. He contended that this made his guilty plea not knowing and expressed that he was "prepared to appeal the [c]ourt's decision not to allow him to withdraw his plea." The government disagreed with Wilks's arguments and stated it would call an expert witness at sentencing to discuss the data.

Wilks also moved for an 18-month downward variance, highlighting several mitigating sentencing factors. First, he noted that he had only one criminal conviction in the prior 20 years—the 2005 conviction. Second, he highlighted that he was instrumental in caring for his wheelchair-bound father, who suffered a stroke in 1998. Third, he asserted that he suffered from chronic pain and health conditions. Finally, he noted that he had maintained full-time employment from July 2019 until his arrest in this case.

The government, on the other hand, moved for an upward variance. It contended that Wilks's criminal history was underrepresented by the guidelines because his 17.5-year term of incarceration for the 2005 conviction led to a low criminal history score. It also noted that Wilks had committed these crimes while on supervised release, which proved ineffective to deter further criminal conduct. It thus argued that Wilks's mitigation argument relying on his criminal history was "hypocrisy." It also noted the

nature and circumstances of the offense were serious, Wilks had engaged in a "meritless" attempt to withdraw his guilty plea, and Wilks had a high chance of recidivism given his criminal history.

At sentencing, Wilks, through counsel, reiterated his objection to the description of his offense conduct, arguing that the description was "put into doubt by the discovery [he] received after he pled guilty" which "undermined the government's case." Counsel then admitted, without objection, various discovery evidence from the government and argued that the evidence showed law enforcement did not track a common phone number that was at both the Centennial Bank and the 7-Eleven where the Nissan Maxima was abandoned. He asserted that his number was not identified on the cell towers associated with the Centennial Bank, severing any tie between him and that robbery. He stated he would not have pled guilty if he knew about this data because, otherwise, there was no one who identified him as being within the bank. He also highlighted the case agent's testimony at the detention hearing that there was no bait money recovered.

The district court noted that there was "a detailed factual proffer here," and that, notwithstanding the cell site data, there was a full explanation of the offense conduct during the change of plea hearing, which Wilks did not object to. Counsel reiterated that the discovery was a sufficient basis for Wilks's motion to withdraw his plea.

The government conceded that, initially, the case manager stated that there was no bait money. However, it stated that, "after

the fact, the FBI" discovered that there was bait money used and was able to match it to the money recovered from Wilks's car. As to the cellphone data and cell site information, the government explained that Wilks "[wa]s conflating two different things." It recognized that law enforcement had not been able to get into Wilks's cellphone and get information from it. Yet it was able to determine Wilks's location through "geo location" which was not derived from Wilks's phone itself. It also explained that this information was provided to Wilks and the Special Agent who prepared the reports, summarized the cell site information, and was present at sentencing to explain the evidence and the process by which Wilks's location was determined. The government also strongly opposed Wilks's attempts to withdraw his plea, highlighting the thoroughness of the colloquy and the factual proffer.

The government then called Special Agent Christopher Goodrich as a witness. Agent Goodrich, who was qualified as an expert in cellular analysis, then testified as follows. T-Mobile "tower dumps" provided data for phone calls for individuals who used the cell tower that covered an address but not data sessions. A "tower dump" received from T-Mobile revealed that Wilks's phone number did not make any phone calls during the Centennial Bank robbery. However, reports of data usage showed Wilks's phone using a tower to the east or southeast of the bank between 11:18 AM and 11:24 AM. Agent Goodrich produced a report plotting the cell towers, which showed that Wilks's phone used cell towers near the vehicle theft around the suspected time of the theft on April 3, 2022, near Centennial Bank on April 4, 2022, near the

suspected coconspirators' houses on April 6, 2022, and moved consistently toward Centennial Bank between 10:57 AM and 11:02 AM on April 6, 2022. On cross-examination, Agent Goodrich clarified that, while one FBI report stated that Wilks's phone was "not identified on the cell towers associated with the Centennial Bank," that report was referencing call data and not data sessions. After hearing this testimony, the court overruled Wilks's objections to the facts in the PSI.

The government then argued for an upward variance and played the surveillance footage of the Centennial Bank robbery to the court. It contended the robbery was "well planned" and "sophisticated" and that Wilks had not stopped committing crimes. Moreover, it reiterated that Wilks had been on supervised release and had just served approximately 17 and a half years for prior crimes. In sum, it contended Wilks was "an aggressive violent individual, and the escalation in his conduct from what he served in federal prison to what he [did] while on federal supervised release shows that he does not belong back on the streets." It asked the court to consider a sentence between 25 and 30 years, which would be necessary to "keep th[e] community safer."

Wilks, in mitigation, highlighted how young he was when his prior convictions occurred, as well as the mitigating facts laid out in his motion for a downward variance. He also contended that he would be sufficiently punished if he received a below-guidelines sentence, given the mandatory seven-year consecutive sentence on Count Two. Wilks then gave an allocution, where he

largely argued that his prior crimes in the 1990s were committed on account of "immatur[ity]" and asked the court to not weigh those convictions. He also stated that he pled guilty because he was scared and did not know how he could "prove" his innocence.

The court explained that its sentencing decisions involved "look[ing] at each individual on [their] own basis" and then explained the basis for its decision. First, it read a portion of the change of plea hearing into the record, clarifying the basis for rejecting Wilks's challenge to the factual proffer which he had entered into. The court concluded, as it had previously ruled, that "nothing legally or factually" supported Wilks's request to withdraw his plea. It clarified that, in 15 years as a judge, "seldomly" had he "granted any upward variance," perhaps "twice, maybe three times." However, it noted Wilks's criminal history "just kept escalating" and "[n]othing good happened while [he] w[as] out" of prison. "[U]nfortunately," it explained, Wilks "engaged in a serious violent crime while on felony probation in federal court in this very same district" and it was "only a matter of time" before he was "going to get caught" for the crimes. It reasoned that, without intervention, Wilks would "continue to live a life of destruction where either" he would end up "dead or someone" would "kill [him] . . . for these type[s] of violent crimes."

Turning to the § 3553(a) factors, the district court explained that Wilks's conduct showed "no respect for the law" and the court had "no hope in terms of recidivism." Moreover, it reasoned that it had to protect the public. It also explained that Wilks had not

come into court accepting responsibility and had chosen to "pretend" like he had not committed the offenses. It denied Wilks's request for a downward variance as "totally inappropriate" because such a sentence would not reflect the seriousness of the offense. Instead, it decided to vary upward from the guidelines and clarified that it would have varied upward even if the government had not asked for it. It also noted that the lengthy sentence for the 2005 offenses had been insufficient to deter Wilks's conduct.

The court sentenced Wilks to a term of 324 months' imprisonment, consisting of 240 months as to Counts One and Three, and 84 months as to Count Two to be served consecutively. The court explained that the variance was "extremely necessary for the protection of the public [and e]xtremely necessary to provide deterrence as there's no remorse [and] no . . . reasonable assurance that [Wilks] w[ould] walk a straight and narrow path" in the future. It also ordered Wilks to serve five years of supervised release upon release from imprisonment. Wilks objected to the length of his sentence and the court overruled that objection. The government then dismissed Count Four and the court adjourned the hearing. The district court later entered judgment consistent with its statements and Wilks appealed.

## II. STANDARDS OF REVIEW

"We 'review the denial of a request to withdraw a guilty plea for abuse of discretion.'" *United States v. Brehm*, 442 F.3d 1291, 1298 (11th Cir. 2006) (quoting *United States v. Freixas*, 332 F.3d 1314, 1316 (11th Cir. 2003)). The abuse of discretion standard of review is

deferential, and "there will be occasions in which we affirm the district court even though we would have gone the other way had it been our call." *Rasbury v. IRS (In re Rasbury)*, 24 F.3d 159, 168 (11th Cir. 1994). In other words, "the abuse of discretion standard allows 'a range of choice for the district court, so long as that choice does not constitute a clear error of judgment.'" *Id.* (quoting *United States v. Kelly*, 888 F.2d 732, 745 (11th Cir. 1989)).

We also "review the substantive reasonableness of a sentence for an abuse of discretion." *United States v. Butler*, 39 F.4th 1349, 1354–55 (11th Cir. 2022). "In reviewing the reasonableness of a sentence, we will not substitute our own judgment for that of the sentencing court and we will affirm a sentence so long as the court's decision was 'in the ballpark of permissible outcomes.'" *Id.* at 1355 (quoting *United States v. Rosales-Bruno*, 789 F.3d 1249, 1257 (11th Cir. 2015) (opinion of E. Carnes, J.)). A party challenging a sentence as unreasonable bears "the burden of establishing the sentence is unreasonable in light of the record and the [18 U.S.C.] § 3553(a) factors." *United States v. Gonzalez*, 550 F.3d 1319, 1324 (11th Cir. 2008). "[W]e have identified three ways in which a district court can abuse its discretion" and "impos[e] a substantively unreasonable sentence: (1) failing to properly consider a relevant sentencing factor that was due significant weight, (2) giving significant weight to a factor that was not relevant, or (3) committing a clear error of judgment by weighing the sentencing factors unreasonably." *Butler*, 39 F.4th at 1356; *see also United States v. Irey*, 612 F.3d 1160, 1189 (11th Cir. 2010) (*en banc*).

## III. DISCUSSION

### A. *The district court did not abuse its discretion in denying Wilks's motions to withdraw his guilty plea.*

On appeal, Wilks argues that his plea was not knowing and that he did not have the benefit of close assistance of counsel. He contends that misadvice of counsel, or ineffective assistance of counsel, are valid reasons for withdrawing his guilty plea. He then argues that his former counsel made a "mis-assessment of the parties' relative evidentiary strengths and weaknesses," and essentially conveyed that Wilks's case was "unwinnable." He points to weaknesses in the "overall strength of the government's cell tower location evidence" and the "bait money" evidence that counsel overlooked and asserts that counsel's failure to inform him of these weaknesses deprived him of a knowing guilty plea. Further, he highlights that he had "a swift change of heart" regarding the plea in less than a week, further suggesting he entered his guilty plea without meaningful knowledge of the government's evidence. The government contends the plea colloquy shows Wilks received close assistance of counsel and that his plea was knowing and voluntary. It also contends that the "weaknesses" Wilks identified were not weaknesses at all and did not justify the withdrawal of Wilks's plea.

"After the district court has accepted a plea and before sentencing, a defendant may withdraw a guilty plea if 'the defendant can show a fair and just reason for requesting the withdrawal.'" *Brehm*, 442 F.3d at 1298 (quoting Fed. R. Crim. P. 11(d)(2)). While

the "fair and just reason" standard should be "liberally construed, . . . there is no absolute right to withdraw a guilty plea." *United States v. Buckles*, 843 F.2d 469, 471 (11th Cir. 1988).

In determining whether a defendant has shown a fair and just reason for withdrawal, we have instructed district courts to look to the "totality of the circumstances surrounding the plea." *Id.* at 471–72. Relevant factors include "(1) whether close assistance of counsel was available; (2) whether the plea was knowing and voluntary; (3) whether judicial resources would be conserved; and (4) whether the government would be prejudiced if the defendant were allowed to withdraw his plea." *Id.* at 472 (citations omitted). If an appellant does not satisfy the first two factors, we need not thoroughly analyze the others. *See United States v. Gonzalez-Mercado*, 808 F.2d 796, 801 (11th Cir. 1987). Still, a "district court's decision [to deny a withdrawal motion] plainly serve[s] the goal of conserving judicial resources, as it obviate[s] the need for a full trial on the merits." *Freixas*, 332 F.3d at 1319. "The longer the delay between the entry of the plea and the motion to withdraw it, the more substantial the reasons must be as to why the defendant seeks withdrawal." *Buckles*, 843 F.2d at 473. On the other hand, "[a] swift change of heart is itself strong indication that the plea was entered in haste and confusion . . . ." *Gonzalez-Mercado*, 808 F.2d at 801 (quoting *United States v. Barker*, 514 F.2d 208, 222 (D.C. Cir. 1975) (*en banc*)).

Regarding the first factor, broadly speaking, "[a] defendant cannot complain of coercion where his attorney, employing his

20                    Opinion of the Court                    24-10137

best professional judgment, recommends that the defendant plead guilty." *Buckles*, 843 F.2d at 472. In *United States v. McCarty*, for instance, an appellant argued that he felt compelled to plead guilty "because he was intimidated into doing so by his lawyer who, he claim[ed], failed to investigate his case or to prepare for trial," but the district court found the appellant "had been ably and professionally represented [and] that close assistance of counsel was available and utilized extensively." 99 F.3d 383, 385 (11th Cir. 1996). On those facts, we found no abuse of discretion in denying the withdraw of the appellant's plea. *Id.* at 396.

On this record, we discern no abuse of discretion. The record indicates that Wilks had close assistance of counsel when he pled guilty. *See Brehm*, 442 F.3d at 1298; *Buckles*, 843 F.2d at 472; *McCarty*, 99 F.3d at 396. At the change-of-plea hearing, Wilks confirmed that he had discussed possible defense strategies with his attorneys and was satisfied with his lawyer's representation and advice. Wilks also stated that his lawyer had done everything he had asked him to do and discussed discovery materials, trial strategy, the plea agreement, the factual proffer, and the maximum and minimum mandatory penalties for the charges. There is a strong presumption that Wilks's statements under oath were true. *See Winthrop-Redin v. United States*, 767 F.3d 1210, 1217 (11th Cir. 2014).

Importantly, while Wilks argues that evidence received in discovery changed the calculus leading to his plea, he has not established that it was unreasonable to recommend he plead guilty even considering this evidence. *Buckles*, 843 F.2d at 472. As the

district court heard at sentencing, the cell site data was not, broadly speaking, beneficial evidence to Wilks. Moreover, plenty of other evidence tied Wilks to the robberies, including the cash deposits into his bank accounts and the bait money the FBI was able to trace to Wilks. In other words, this is not a situation where a defendant pled guilty and then became privy to information that substantially undermined the government's case or proved he had not committed the crimes charged.

Second, the record indicates that Wilks's guilty plea was knowing and voluntary. Indeed, Wilks does not challenge the sufficiency of the district court's Rule 11 colloquy at the change of plea hearing and conceded below that it was thorough. We likewise conclude that the district court's thorough colloquy satisfied the core concerns of Rule 11. *See United States v. Moriarty*, 429 F.3d 1012, 1019 (11th Cir. 2005). The court explicitly ensured that Wilks was competent to proceed, that he understood the charges and the plea agreement, and appreciated the rights he was giving up and the consequences of his plea. Moreover, Wilks explicitly acknowledged the factual proffer that he committed the offenses as charged and confirmed that he was doing so of his own free will. Again, the district court permissibly found that Wilks's statements on these issues were true. *Winthrop-Redin*, 767 F.3d 1217.

While Wilks did move to withdraw his plea shortly after entering it, suggesting that he may have quickly changed his mind, *Gonzalez-Mercado*, 808 F.2d at 801; *Barker*, 514 F.2d at 222, none of the other factors a court considers in the totality of circumstances

suggest that Wilks's plea was entered in haste and confusion. In addition, the denial served "the goal of conserving judicial resources, as it obviated the need for a full trial on the merits." *Freixas*, 332 F.3d at 1319.

To the extent that Wilks raises an ineffective assistance challenge, "[e]xcept in the rare instance when the record is sufficiently developed, we will not address claims for ineffective assistance of counsel on direct appeal." *United States v. Verbitskaya*, 406 F.3d 1324, 1337 (11th Cir. 2005), *abrogated in part on other grounds by United States v. Durham*, 795 F.3d 1329, 1330–31 (11th Cir. 2015) (*en banc*); *see also United States v. Merrill*, 513 F.3d 1293, 1308 (11th Cir. 2008). This is not one such "rare instance," so we reject this challenge without prejudice to Wilks bringing it in a collateral attack under 28 U.S.C. § 2255. *Verbitskaya*, 406 F.3d at 1337; *Merrill*, 513 F.3d at 1308.

For the reasons we have explained, the district court acted within its "range of choice" in denying Wilks's motions to withdraw his plea and we do not see any "clear error of judgment" on this issue. *Rasbury*, 24 F.3d at 168 (quoting *Kelly*, 888 F.2d at 745).

### B. Wilks has not shown that his sentence is substantively unreasonable.

Wilks next argues that the district court's variance from the guidelines range was unreasonable. He asserts that the district court's focus on deterrence and public safety was "unjustified" because it was based on "uncharged" and "imagined" conduct. He also contends that the court ignored the fact that he had not

committed violent felonies in the three years prior to this crime and in the four years subsequent, suggesting this crime was an outlier. The government, conversely, argues Wilks's sentence is not unreasonable, and that Wilks's arguments do not show an abuse of the district court's broad sentencing discretion.

Under § 3553(a), a sentencing court must impose a sentence that is "sufficient, but not greater than necessary . . . to reflect the seriousness of the offense, to promote respect for the law, . . . to provide just punishment for the offense, . . . to afford adequate deterrence," and "to protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2). The court also must consider, among other factors, "the nature and circumstances of the offense and the history and characteristics of the defendant," as well as "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." *Id.* § 3553(a)(1), (6).

Though the district court must consider all relevant § 3553(a) factors, "the weight given to each factor is committed to the sound discretion of the district court," and it may attach great weight to one factor over the others. *Butler*, 39 F.4th at 1355. A court's "failure to discuss . . . 'mitigating' evidence" does not indicate that the court "erroneously 'ignored' or failed to consider th[e] evidence in determining [the defendant's] sentence." *United States v. Amedeo*, 487 F.3d 823, 833 (11th Cir. 2007). "Rather, a district court's acknowledgment that it has considered the §3553(a) factors and the parties' arguments is sufficient." *Butler*, 39 F.4th at

1355 (citing *United States v. Sarras*, 575 F.3d 1191, 1219 (11th Cir. 2009)). Generally, a sentence "well below the statutory maximum" is an indicator of reasonableness. *United States v. Riley*, 995 F.3d 1272, 1278 (11th Cir. 2021) (quoting *United States v. Stanley*, 739 F.3d 633, 656 (11th Cir. 2014)).

Like all sentences, upward variances are imposed based on the § 3553(a) factors. *See United States v. Overstreet*, 713 F.3d 627, 637–38 (11th Cir. 2013). We have held that "a sentencing court may impose an upward variance based upon uncharged conduct as it relates to the history and characteristics of the defendant, as well as the need to promote respect for the law, afford adequate deterrence, and protect the public." *Butler*, 39 F.4th at 1355. It may also do so if it finds "the Guidelines range was insufficient in light of a defendant's criminal history." *Id.* "[D]istrict courts are afforded 'broad leeway in deciding how much weight to give to prior crimes the defendant has committed.'" *Id.* (quoting *Rosales-Bruno*, 789 F.3d at 1261).

"A district court making an upward variance must have a justification compelling enough to support the degree of the variance . . . . " *United States v. Dougherty*, 754 F.3d 1353, 1362 (11th Cir. 2014). Still, we will vacate an upward variance sentence "only if 'we are left with the definite and firm conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence that lies outside the range of reasonable sentences dictated by the facts of the case.'" *United*

*States v. Early*, 686 F.3d 1219, 1221 (11th Cir. 2012) (quoting *United States v. Shaw*, 560 F.3d 1230, 1238 (11th Cir. 2009)).

Wilks has not shown the district court abused its discretion. As the district court noted, Wilks pled guilty to incredibly dangerous violent crimes. The district court permissibly considered the dangerousness and violent nature of the acts in making its sentencing decision. *See* 18 U.S.C. § 3553(a)(1) (requiring sentencing courts to consider "the nature and circumstances of the offense"); *id.* § 3553(a)(2) (requiring sentences "to reflect the seriousness of the offense"); *Riley*, 995 F.3d at 1280 ("Violent offenders are often good candidates for upward variances."). Moreover, the district court acted within its discretion in concluding that Wilks's criminal history was not mitigating but, rather, was aggravating. Wilks served over a decade in federal prison for crimes he committed at 22 years old. *See Wilks*, 464 F.3d at 1245. Even at that time, the district court had "concerns about the seriousness of the offense [and] Wilks' significant criminal history," despite his young age. *Id.* Once released, and while still on supervised release, Wilks committed these two armed bank robberies. We give the district court "broad leeway in deciding how much weight to give to prior crimes" and we cannot say the district court erred in giving this criminal history significant weight. *Butler*, 39 F.4th at 1355 (quoting *Rosales-Bruno*, 789 F.3d at 1261). As the district court noted, these crimes "kept escalating" and "nothing good happened" while Wilks was out of prison—he committed more crimes. These facts supported the district court's decision to vary upward and supported the degree of that variance. *Dougherty*, 754 F.3d 1362.

Further, Wilks's sentence was far below the statutory maximums for Counts One and Three. *See Riley*, 995 F.3d at 1278.

Finally, we disagree with Wilks's contention that he was sentenced based on "uncharged" or "imagined" conduct. Instead, as the district court explained, Wilks was sentenced based on his conduct in this case and the factors in § 3553(a). Those factors permit and require the district court's consideration of Wilks's past crimes, his chances of recidivism, and his lack of remorse. *See* 18 U.S.C. § 3553(a). Thus, Wilks has not shown error.

## IV. CONCLUSION

For the reasons we have explained, Wilks has not shown that the district court abused its discretion in denying his motion to withdraw his plea. He also has not shown that his sentence falls outside "the ballpark of permissible outcomes." *Butler*, 39 F.4th at 1355. Accordingly, we affirm his conviction and sentence.

**AFFIRMED.**